Roger Lee JONES, Plaintiff,

v.

Edguardo A. CONSUEGRA'S ESTATE,
et al., Defendants.

No. 3:02–CV–42–J–99HTS.

United States District Court,
M.D. Florida,
Jacksonville Division.

Sept. 22, 2004.

Roger Lee Jones, Raiford, FL, pro se, plaintiff.

Mark J. Hiers, Asst. Attorney General, Diogenes A. Arteaga, M.D., Barbara Ann Porterfield and Chuong Le, M.D., Tallahassee, FL, Counsel for Defendants.

Jeannette M. Andrews, Ben Allen Andrews, Andrews, Crabtree, Knox & Andrews, LLP, Prison Health Services, Inc. and American Services Group, Tallahassee, FL, Counsel for Defendants.

Saalfield, Coulson, Shad & Jay, P.A., Harvey L. Jay, III, Trudy E. Innes, Alejandro Radi, M.D., Jacksonville, FL, for Defendant.

*ORDER*

SCHLESINGER, District Judge.

**I. Status**

On October 25, 2001, Plaintiff Roger Lee Jones, an inmate of the Florida penal system proceeding *pro se,* initiated this action in the United States District Court for the Northern District of Florida by filing a civil rights Complaint (Doc. # 7) pursuant to 42 U.S.C. § 1983. On January 9, 2002, the case was transferred to this Court. *See* Court's Order of Transfer (Doc. # 5). Plaintiff filed an Amended Complaint (Doc. # 17) on June 7, 2002, and thereafter filed a Second Amended Complaint (Doc. # 48) on February 26, 2003.

On August 18, 2003, Plaintiff Roger Lee Jones filed a Third Amended Complaint (Doc. # 74), in which he names the following Defendants: (1) Prison Health Services, Inc., in Florida (PHS–1); (2) Edguardo A. Consuegra's Estate; (3) Diogenes A. Arteaga, M.D.; (4) Chuong Le, M.D.; (5) Canh T. Nguyen, M.D.; (6) Barbara Ann Porterfield, Nurse; (7) Alejandro Radi, M.D.; (8) American Services Group in Delaware; (9) C.B. Bowlan, Senior Health Services Administrator; and, (10) Prison Health Services, Inc., in Tennessee (PHS–2). On January 8, 2004, this Court dismissed Defendants Prison Health Services and American Services Group. *See* Court's Order (Doc. # 109), filed January 8, 2004, at 2, paragraph 3.

Before the Court are the following motions: (1) Defendants Arteaga, Porterfield, Le, Bowlan, Estate of Edguardo A. Consuegra, and Nguyen's Motion for Summary Judgment (Doc. # 83)[1]; (2) De-

1. This Court granted Defendants Bowlan and Nguyen's Motions to Adopt Defendants' Motion for Summary Judgment (Docs.# 102, 143). *See* Court's Orders (Docs.# 109, 161). In the event that Defendants Juan Carlos Consuegra and/or Mireya Consuegra, Executrix and/or Administrator of the Estate of Edguar-

do A. Consuegra's Motion to Dismiss the Third Amended Complaint (Doc. # 129) is denied, they have requested to adopt Defendants' Motion for Summary Judgment (Doc. # 83). Their motion to adopt the arguments contained within Defendants' Motion for Summary Judgment will be granted, and their

fendant Radi's Motion for Summary Judgment (Doc. # 124); (3) Defendants' Juan Carlos Consuegra and/or Mireya Consuegra, Executrix and/or Administrator of the Estate of Edguardo A. Consuegra, Motion to Dismiss the Third Amended Complaint (Doc. # 129); (4) Plaintiff's Motion to Accept State Jurisdiction (Doc. # 179); and, (5) Plaintiff's Motions for Enlargement of Time (Docs.# 181, 184).[2]

In support of their motions for summary judgment, Defendants have submitted exhibits (hereinafter Ex.). Plaintiff has been instructed on how to respond to motions for summary judgment and has been given sufficient time in which to respond. See Court's Order (Doc. # 176), filed June 18, 2004, at 2, paragraphs 5 and 7 (granting Plaintiff an additional sixty days from the date of the Order to respond to the motions for summary judgment and the Defendants' medical affidavit in support of their motions for summary judgment); Court's Order (Doc. # 161), filed April 23, 2004, at 4–5, paragraph 15; Court's Order

(Doc. # 109), filed January 8, 2004, at 3, paragraph 6; Court's Order (Doc. # 92), filed October 15, 2003; Court's Order (Doc. # 24), filed September 25, 2002, at 5–7. Plaintiff has submitted a multitude of exhibits in support of his claims and in support of his assertion that he has sufficiently exhausted all of his claims presented to this Court. Finally, Plaintiff has responded with supporting exhibits. See Composite Exhibit A (containing ninety-nine exhibits) and Composite Exhibit B (containing fifty-five exhibits); Composite Exhibit W.[3] See Plaintiff's Response and Objection to the Defendants' Motion for Summary Judgment (Doc. # 185), filed September 17, 2004.

## II. Plaintiff's Allegations and Claims

Plaintiff contends that he was denied proper medical care during his incarceration at Baker Correctional Institution (hereinafter BCI) from March 25, 1999, through July 24, 2000. Specifically, he states that he suffered from gastro-esophagus reflex disease (hereinafter GERD),

---

Motion to Dismiss will be construed as a motion for summary judgment.

2. The record reflects that Plaintiff has been given an adequate amount of time for discovery in this action. Additionally, the record shows that the Court was very liberal in granting extensions of time to Plaintiff and in instructing Plaintiff on how to properly proceed. Plaintiff has had over one year to respond to Defendants' Motion for Summary Judgment (Doc. # 83), filed September 19, 2003. And, after the filing of Dr. Cherry's Affidavit, Plaintiff had over four months to respond. Because Plaintiff is proceeding pro se and has had difficulty with the prison's mailing system, this Court will grant Plaintiff's Motions for Enlargement of Time (Docs.# 181, 184) and accept Plaintiff's Response and Objection to the Defendants' Motion for Summary Judgment (Doc. # 185) regardless of the fact that it is not in compliance with Local Rule 3.01(c) (in excess of twenty pages in length).

3. Plaintiff has submitted approximately one-hundred and fifty-eight exhibits. Composite

Exhibit A consists of Plaintiff's own affidavits, which are undated, are not notarized and do not contain Plaintiff's original signature. See 28 U.S.C. § 1746. Composite Exhibit B comprises a variety of exhibits, including grievances and responses, and Composite Exhibit W contains inmate witnesses' affidavits (Bryan K. Hogan, Timothy Felize, Jerry W. Jones and Rodney Wilson). These affidavits are not notarized and do not contain original signatures; however, they are dated. Inmates Hogan and Felize state that they have signed consultation sheets in "blank" at other institutions; inmate Jerry Jones describes Plaintiff's pain while passing kidney stones; and, inmate Rodney Wilson explains Plaintiff's changed personality as a result of taking pain medication. Even accepting Plaintiff's affidavits as properly filed, Defendants' Motions for Summary Judgment and the Motion to Dismiss, construed as a motion for summary judgment, will be granted since they are entitled to summary judgment for the reasons stated in Section VI.

colon cramps and bleeding, hemorrhoids, diarrhea, bleeding kidneys, sinus problems, a kidney stone and pain from a broken nose. *See* Third Amended Complaint at 5–19. He states that, because Dr. Consuegra did not properly treat his GERD, he now suffers from Barrett's Esophagus, a precancerous condition. *Id.*

Defendant Consuegra, as the Chief Health Officer at BCI (now deceased), was responsible for ensuring that all inmates received adequate medical care. *Id.* at 6. Plaintiff claims that he was notified of the delays and denial of medical care, but failed to correct the problems. *Id.* Plaintiff states that Defendant Arteaga, the Senior Physician at BCI during the relevant time period, was Plaintiff's physician; Defendants Nguyen and Le were part-time physicians; Defendant Porterfield was the Senior Licensed Practical Nurse; Defendant Bowlan was the Senior Health Services Administrator, who was responsible for researching medical inquiries posed to the defendant physicians; and, Defendant Alejandro Radi was a subcontracted gastrointestinal physician at North Florida Reception Center. *Id.* at 6–7.

On January 8, 2004, this Court granted Plaintiff's Motion to Dismiss Without Prejudice the Plaintiff's State Tort Law Claim (Doc. # 95); stated that Plaintiff's "Section M" of the Third Amended Complaint (Doc. # 74) would not be addressed; and, therefore dismissed his state tort law claims. *See* Court's Order (Doc. # 109), filed January 8, 2004, at 3–4, paragraph 9.

### III. Exhaustion

Exhaustion of available administrative remedies is required before a 42 U.S.C. § 1983 action with respect to prison conditions by a prisoner may be initiated in this Court. The Eleventh Circuit recently stated:

Before considering the merits of this case, we must address a threshold matter. According to 42 U.S.C. § 1997e(a), enacted as part of the Prison Litigation Reform Act (the "PLRA"),

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The PLRA's effective date was April 26, 1996; because the prisoners filed their complaint after this date, the PLRA applies. *Higginbottom v. Carter,* 223 F.3d 1259, 1260 (11th Cir.2000). A district court must dismiss the suit when it finds that the plaintiff-inmate has not exhausted his administrative remedies. *Cf. Brown v. Sikes,* 212 F.3d 1205, 1207 (11th Cir.2000). . . .

*Chandler v. Crosby,* 379 F.3d 1278, 1286 (11th Cir.2004).

■ While Plaintiff was incarcerated at BCI, he grieved, through the administrative grievance procedures, his medical complaints. Plaintiff has provided the Court with a multitude of exhibits to support his assertion that he has sufficiently exhausted the claims presented to this Court. *See* Plaintiff's Response and Objection to the Defendants' Motion for Summary Judgment (Doc. # 185), Composite Exhibit B; Third Amended Complaint, Appendix A.

Specifically, he informed the officials that Defendant Le, with his "could care less" attitude, failed to properly treat him for his GERD and colon and kidney pain; the prison officials responded to Plaintiff that his grievance was thoroughly reviewed and evaluated, and that "[t]he physicians are aware of [his] condition and [he is] being provided adequate care." Third Amended Complaint, Appendix A. Further, he grieved the issues with respect to his kidney stone and diarrhea and the involvement of Defendants Consuegra, Ar-

teaga and Le. *Id.* In response, the officials stated that his request was thoroughly reviewed and evaluated, that review of the record reflected that the physician was treating him appropriately, and that "it will be the physician who decides what courses of treatment will be done." *Id.* Defendants Arteaga and Consuegra, in response to Plaintiff's November 18, 1999, grievance, specifically notified Plaintiff regarding the status of his kidney and colon concerns, stating in pertinent part:

> Dr. Consuegra called you out on 11/22/99 and discussed fully, per the instructions of Tallahassee, all your issues. Further, there is already a urological consult requested for approval to address your kidney concerns and that on 11/24/99 you were seen regarding your colon pain. Your conditions will continue to be addressed appropriately, as the physician determines your course of treatments.

*Id.* Further, on appeal to the Secretary of the Florida Department of Corrections, Emile L. Baudoin d'Ajoux stated:

> Your request for administrative remedy was received at this office and it was carefully reviewed. Records available to this office were also reviewed. In addition, your health care staff was contacted[,] and they provided this office with information regarding the issues you presented. It is determined that the response made to you by Dr. Consuegra on 12/9/99 appropriately addressed the issues presented by you. It is the responsibility of your Chief Health Officer to determine the appropriate treatment regimen for the condition you are experiencing. Records indicate you have been transferred to NFRC and on

1/14/2000 you underwent electro-shock wave lithotripsy. You were last seen on 1/21/2000 by the physician assistant in [the] outpatient clinic regarding rectal bleeding. You are scheduled to be seen by the Urologist in the near future. Should you experience problems, sick call is available so that you may present your concerns to your health care staff.

*Id.*

The record also reflects that Plaintiff complained, through the grievance procedures, with respect to nose pain. *Id.* Plaintiff was notified that it is the physician's determination as to whether he would be referred to a specialist. *Id.*

Plaintiff also grieved his claim with respect to Defendant Porterfield concerning his stool specimen; the response appropriately addressed the issue, noting that Nurse Porterfield properly discarded the specimen since "[b]ody excretions are to be collected and handled appropriately ..." and Plaintiff had not done so. Plaintiff's Composite Exhibit B 32. Once again, Plaintiff Jones was informed that "[i]t will be the physician who determines the need for any outside consultations ... and his decision will be based on appropriately done screenings." Composite Exhibit B 32, 35, 55.

This Court concludes that Plaintiff has sufficiently exhausted his administrative grievance remedies, especially in light of the fact that this case was originally filed on October 25, 2001, and Plaintiff Jones' medical claims center upon events arising from 1999 through 2000.[4] The grievances submitted by Plaintiff Jones in support of his Third Amended Complaint and in his Response and Objection to the Defendants'

---

4. Of course, since exhaustion is a "precondition" to the filing of an action in federal court, it is clear that any claims that Plaintiff grieved *after* the filing of this lawsuit have not been sufficiently exhausted for purposes of this action. *See* 42 U.S.C. § 1997e(a); Defendants' Motion for Summary Judgment (Doc. # 83) at 18–19; Defendants' Composite Exhibit D.

Motion for Summary Judgment (Doc. # 185) are sufficient to show exhaustion of the medical issues presented to this Court.

### IV. Summary Judgment Standard

With respect to the standard for granting summary judgment, the Eleventh Circuit Court of Appeals has stated:

[S]ummary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

*In re Optical Technologies, Inc.,* 246 F.3d 1332, 1334 (11th Cir.2001).

The parties' respective burdens and the Court's responsibilities are outlined as follows:

The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. *Taylor v. Espy,* 816 F.Supp. 1553, 1556 (N.D.Ga.1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*[,] 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark. Inc.,* 929 F.2d 604, 608 (11th Cir.1991).

Applicable substantive law will identify those facts that are material. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* For factual issues to be considered genuine, they must have a real basis in the record. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2505. The Court must avoid weighing conflicting evidence or making credibility determinations. *Id.* at 255, 106 S.Ct. at 2513–14. Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

*Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918–19 (11th Cir.1993); *see Mulhall v. Advance Sec. Inc.,* 19 F.3d 586, 589–90 (11th Cir.), *cert. denied,* 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994).

"It is true that on a motion for summary judgment, all reasonable inferences must be made in favor of the non-moving party." *Cuesta v. School Bd. of Miami–Dade County,* 285 F.3d 962, 970 (11th Cir.2002) (citation omitted). "A court need not permit a case to go to a jury, however, when

the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Id.* (citations omitted).

> If a reasonable jury could not find in favor of the nonmoving party, no genuine issue of material fact does exist; and summary judgment is proper. *Beal v. Paramount Pictures Corp.,* 20 F.3d 454, 459 (11th Cir.1994). A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). As Fed.R.Civ.P. 56(e) states, "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

*Young v. City of Palm Bay, Fla.,* 358 F.3d 859, 860 (11th Cir.2004). Thus, "[s]ummary judgment should be granted when, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *Nolen v. Boca Raton Community Hospital, Inc.,* 373 F.3d 1151, 1154 (11th Cir.2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## V. Cruel and Unusual Punishment

In any 42 U.S.C. § 1983 cause of action, the initial inquiry must focus on whether the two essential elements to a section 1983 action are present.

> A successful section 1983 action requires a showing that the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992); *Hale v. Tallapoosa County,* 50 F.3d 1579 (11th Cir.1995).

With regard to Plaintiff's claim of being subjected to cruel and unusual punishment in violation of the Eighth Amendment, the Eleventh Circuit has stated:

> Although the United States Constitution does not require comfortable prisons, neither does it permit inhumane ones. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment governs "the treatment a prisoner receives in prison and the conditions under which he is confined." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). However, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the 'unnecessary and wanton infliction of pain' ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham v. Wright,* 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations omitted)).

*Farrow v. West,* 320 F.3d 1235, 1242–43 (11th Cir.2003).

With reference to the denial of medical care, the Eleventh Circuit further explained:

> In *Estelle v. Gamble,* the Supreme Court held that a prison official's "deliberate indifference to [the] serious medical needs of [a] prisoner[ ] constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment." *Estelle,* 429 U.S. at 104,

97 S.Ct. 285, 50 L.Ed.2d 251 (quotation marks and citation omitted); *see Campbell v. Sikes,* 169 F.3d 1353, 1363 (11th Cir.1999). "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" *McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir.1999) (citation omitted); *see Estelle,* 429 U.S. at 106, 97 S.Ct. 285, 50 L.Ed.2d 251 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle,* 429 U.S. at 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251.

To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry. *Taylor v. Adams,* 221 F.3d 1254, 1257 (11th Cir.2000); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir.1995). First, a plaintiff must set forth evidence of an objectively serious medical need. *Taylor,* 221 F.3d at 1258; *Adams,* 61 F.3d at 1543. Second, a plaintiff must prove that the prison official acted with an attitude of "deliberate indifference" to that serious medical need. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811; *McElligott,* 182 F.3d at 1254; *Campbell,* 169 F.3d at 1363.

*Farrow,* 320 F.3d at 1243.

When describing a serious medical need, the Eleventh Circuit stated:

In our circuit, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1187 (11th Cir.1994) (quota-

tion marks and citation omitted). In either of these situations, the medical need must be "one that, if left unattended, 'pos[es] a substantial risk of serious harm.'" *Taylor,* 221 F.3d at 1258 (alteration in original) (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811). Our precedent recognizes a range of medical needs that are sufficiently serious to constitute "serious medical needs" for purposes of the Eighth Amendment and some medical needs that are not.

*Farrow,* 320 F.3d at 1243 (footnotes omitted).

The Eleventh Circuit, when addressing a claim of deliberate indifference to a serious medical need, has succinctly captured the state of the law with respect to what actually constitutes deliberate indifference:

In *Estelle,* the Supreme Court established that "deliberate indifference" entails more than mere negligence. *Estelle,* 429 U.S. at 106, 97 S.Ct. 285, 50 L.Ed.2d 251; *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970, 128 L.Ed.2d 811. The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (emphasis added). In interpreting *Farmer* and *Estelle,* this Court explained in *McElligott* that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott,* 182 F.3d

at 1255; *Taylor*, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

This Court has provided guidance concerning the distinction between "deliberate indifference" and "mere negligence." For instance, we have stated that "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997). Alternatively, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255. For example, a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference. *Hill*, 40 F.3d at 1190 n. 26; *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir.1986) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir.1985)). *Farrow*, 320 F.3d at 1245–46.

 Thus, a plaintiff must prove, in order to show a sufficiently serious deprivation made with the subjective intent to punish, that a defendant had "knowledge of a serious medical risk and a disregard of that risk by conduct that is more than mere negligence." *Flowers v. Bennett*, 135 F.Supp.2d 1150, 1154 (N.D.Ala.2000) (cita-

tions omitted). Wanton conduct can be "treatment 'so cursory as to amount to no treatment at all[,]'" *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir.2000) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir.1985)), *cert. denied*, 531 U.S. 1077, 121 S.Ct. 774, 148 L.Ed.2d 673 (2001), or delay when it is apparent that delay would exacerbate the medical condition, it does so, and the delay is not medically justified. *Id.* (citing *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187, 1187–89 (11th Cir.1994)).

## VI. Facts and Conclusions of Law

### A. Deliberate Indifference

Defendants have submitted the Affidavit of Dr. Daniel P. Cherry, III, D.O.[5] Dr. Cherry reviewed Plaintiff's medical records and, based upon his personal knowledge, education, training and experience, concluded that "Roger Lee Jones was provided sufficient and adequate medical services while at Baker Correctional Institution during the relevant time periods." *See* Notice of Filing the Affidavit of Dr. Daniel Cherry (Doc. # 165) (hereinafter Cherry's Affidavit). He concluded "[i]t is further my opinion that there are no grounds to support any allegations of negligence or deliberate indifferent medical care, nor are there reasonable grounds to believe that the medical care provided to the Plaintiff deviated from the prevailing professional standards of medical care." *Id.*

Further, Defendant Radi, in support of his Motion for Summary Judgment, submitted the Affidavit of Dr. Byron Kolts, M.D., F.A.C.P. *See* Defendant's Motion for Summary Judgment (Doc. # 124), Exhibit A, Affidavit (hereinafter Kolts' Affidavit).

---

**5.** Dr. Cherry is the Department of Corrections' Regional Medical Executive Director for Region I and has oversight responsibility over the delivery of health services to all Department of Corrections' inmates in Region I. *See* Notice of Filing the Affidavit of Dr. Daniel Cherry (Doc. # 165).

As an expert in the field of gastroenterology, he concluded that "there are no reasonable grounds to believe that Alejandro Radi, M.D., deviated from the prevailing professional standard of care that caused or contributed to any harm or injury to Roger Lee Jones." *Id.*

This Court has conducted a thorough and in-depth review of the medical records, the affidavits submitted by the Defendants and the exhibits submitted by Plaintiff throughout the record of this case. A chronology of the medical treatment provided to Plaintiff Roger Lee Jones, during the relevant time period, is set forth below.

Plaintiff Roger Lee Jones was transferred from Santa Rosa Correctional Institution to BCI on March 24, 1999. Ex. 1. At that time, Plaintiff's medical problems were listed as GERD, UTI (urinary tract infection), hemorrhoids, and a history of skin cancer. *Id.* At the time of his transfer, he was receiving Cipro, an antibiotic, for his urinary tract infection. *Id.* Plaintiff, in a pre-confinement health appraisal, complained about a bleeding kidney. Ex. 2. Defendant Arteaga, as the Senior Physician at BCI, examined Plaintiff Jones the next day (March 25, 1999) in the Doctors Clinic. Ex. 3. He diagnosed chronic low back pain, GERD, hiatal hernia, hearing impairment, and bilateral carpal tunnel syndrome. *Id.* He noted, in the medical notes, that Plaintiff Jones was asymptomatic. *Id.*

On March 26, 1999, Plaintiff Jones provided a urine sample for laboratory analysis, and the laboratory results were reviewed on March 29, 1999, by Dr. Consuegra, as the Chief Health Officer at BCI. Ex. 4. The next day, Plaintiff was seen in the General Medicine Clinic by Defendant Arteaga, who noted that Plaintiff's medications included Tylenol, Maalox (an antacid), Beconase Nasal Inhaler, Chlorpheniramine (an antihista-mine), and Metamucil. Ex. 5. Plaintiff's Hematocrit and Hemoglobin levels were normal; however, Defendants Arteaga and Porterfield noted that Plaintiff had a history of hematuria (blood in the urine). *Id.* Plaintiff's urine laboratory results were normal. *Id.* Defendant Arteaga ordered a repeat of the urinalysis in two weeks. *Id.*

On March 31, 1999, Defendants Porterfield, Arteaga, and Bowlan saw Plaintiff concerning his diet (3600 calories). Ex. 6. On April 9, 1999, Defendant Arteaga reviewed additional laboratory work, noting, "abnormal urine—hematuria." Ex. 7. On April 14, 1999, Defendant Arteaga reviewed additional laboratory work, noting it was normal. Ex. 8. On April 26, 1999, another urinalysis was done and sent to the laboratory for additional testing. *Id.*

On April 30, 1999, Defendant Arteaga examined Plaintiff in the Doctors Clinic again. Ex. 10. Plaintiff wanted his medications reviewed and complained of intolerance to all antacids. *Id.* Defendant Arteaga diagnosed hemorrhoids and constipation, prescribed Metamucil and Preparation H and then referred Plaintiff to gastroenterology. *Id.* Defendant Porterfield noted that an appointment with gastroenteroloy should be scheduled. *Id.* That same day (April 30, 1999), Defendant Consuegra filled out a Consultation Request for Plaintiff Jones to be seen by gastroenterology at North Florida Reception Center. Ex. 11. Defendant Consuegra noted that Plaintiff had GERD and a mild hiatal hernia and recommended Propulsid (used to treat severe nighttime heartburn), Prilosec (a proton-pump inhibitor used to block acid), Tagamet (used to reduce stomach acid), Zantac (used to reduce stomach acid), and Pepcid (used to reduce stomach acid) as treatment options. *Id.* However, he noted that Plaintiff had complained that

he had experienced a negative reaction (hallucinations) to anti-acid medications. *Id.*

On May 6, 1999, Defendant Consuegra examined Plaintiff Jones in the Doctors Clinic. Ex. 12. He noted an old nasal fracture with no significant displacement. *Id.* He prescribed Indocin (a non-steroidal drug with analgesic and anti-inflammatory properties) for Plaintiff Jones' shoulder pain. *Id.* Four days later, Plaintiff was seen in confinement sick call, complaining of medication allergies. Ex. 13. He advised Nurse Taylor that he had had kidney stones nineteen times and that the last kidney stone was in 1991. *Id.* He also stated that he was on antibiotics for a kidney infection a few weeks before. *Id.* A urine dipstick analyzed by Nurse Taylor revealed trace protein and trace blood. *Id.* He complained of kidney pain and was referred to a medical doctor. *Id.*

On May 13, 1999, Defendant Consuegra examined Plaintiff Jones for his complaints of flank pain. Ex. 14. Defendant Consuegra saw no evidence of kidney stones, but he nonetheless ordered a KUB (kidney-ureter-bladder) x-ray to rule out kidney stones. *Id.* Plaintiff was transported to North Florida Reception Center the next day (May 14, 1999). *Id.* Dr. V.M. Saenz, M.D., North Florida Reception Center's radiologist, read the KUB x-ray. Ex. 15. The x-ray was compared with a scout film for an intravenous pyelogram[6] (hereinafter IVP) performed in April of 1991. *Id.* A five millimeter (in maximum diameter), small, fairly round, calcific density projecting in Plaintiff's left flank area was noted. *Id.* Dr. Saenz further documented that the calcific density most prob-

ably corresponds to a calculus within Plaintiff's mid-portion of the left kidney and remains grossly unchanged in size and position. *Id.* He concluded that he did not believe the calculus was producing any symptoms. *Id.* He further noted that no calcifications were in the right flank or the pelvic region and that the bony structures appeared unremarkable. *Id.* Defendant Consuegra signed off on the KUB on May 20, 1999. *Id.*

On May 19, 1999, Plaintiff Jones was examined in the emergency room due to his complaints of bloody, liquid stool. Ex. 17; Ex. 18. Nurse Thomas noted no bleeding; however, the nurse referred him to a medical doctor. Ex. 17. Defendant Consuegra reviewed the report and prescribed Lomotil (used to treat spasms of the stomach and intestines). Ex. 17. The next day, Defendant Consuegra reviewed Plaintiff's KUB. Ex. 19.

On May 21, 1999, during confinement sick rounds, Plaintiff Jones complained to the nurse that he was allergic to medications for acid reflux, that the medication hurt his stomach, that he had a headache, that his shoulder gave him pain, and that he was bleeding from his kidney. *Id.* The nurse noted that Plaintiff exhibited no facial expressions of pain, and she noted no blood when he urinated. *Id.* The nurse referred Plaintiff to a medical doctor for a further evaluation. *Id.* Plaintiff was also seen on May 25, 1999, for other medical complaints (refills of Metamucil and Preparation H; hearing aid problems). Ex. 20.

On May 28, 1999, Defendant Arteaga examined Plaintiff for his Biennial Physical Exam. Ex. 21. Plaintiff complained of

---

6. An Intravenous Pyelogram (IVP) is an x-ray examination of the kidneys, ureters, and urinary bladder. http://www.radiologyinfo.org. An IVP study uses a contrast material to enhance the x-ray images. *Id.* The contrast material is injected into the patient's system, and its progress through the urinary tract is then recorded on a series of quickly captured images. *Id.* The examination then enables the radiologist to review the patient's anatomy and the function of the kidneys and urinary tract. *Id.*

kidney and shoulder pain. *Id.* Defendant Arteaga prescribed Tylenol, Maalox, Chlorpropamide, and Metamucil. *Id.* He ordered that Plaintiff's stool be checked for blood. *Id.*

On May 31, 1999, Plaintiff complained to Nurse Taylor of kidney and shoulder pain, a stopped-up nose and acid reflux. Ex. 23. On June 7, 1999, Defendant Arteaga evaluated Plaintiff's numerous pains and complaints. Ex. 24. He diagnosed "r/o (rule out) kidney stone (rt)," prescribed Dimetapp, a Beconase nasal inhaler, and Maalox and ordered a stool test for parasites and an IVP.Ex. 24; Ex. 25.

On June 11, 1999, Defendant Arteaga noted that Plaintiff's stool was negative for blood. Ex. 25. Two days later (June 13, 1999), Plaintiff complained of rectal pain to Nurse Godwin during confinement sick call. Ex. 26. Nurse Godwin noted his complaints and referred him for evaluation to a medical doctor for the next morning. *Id.* Defendant Arteaga saw Plaintiff Jones the next day (June 14, 1999). Ex. 27. He diagnosed internal hemorrhoids and prescribed Anusol–HC suppositories (for use in inflamed hemorrhoids). *Id.* The IVP was performed on June 14, 1999. Ex. 27; Ex. 28. The following was noted with respect to the results:

> He complains of pain in both flanks being slightly worse on the right side. The scout film demonstrates normal gas pattern. Again noted is a 5mm calcific density projected in the area of the lower pole of the left kidney unchanged in position since previous examination. Again I see no evidence of opaque calculi in the right flank, the pathway of the ureter or the pelvic region. Prompt and symmetric renal function is demonstrated. The collecting systems appear unremarkable and there is no dilatation on either side. The ureters were visualized segmentally and revealed no evidence of obstruction. The partially opacified

bladder appeared unremarkable. There is practically no residual in the post void film.

> IMPRESSION: AGAIN DEMONSTRATED IS A 5MM CALCULUS WHICH IS LOCATED WITHIN ONE OF THE CALYCES TO THE LOWER POLE OF THE LEFT KIDNEY AND REMAINS UNCHANGED IN POSITION. GOOD BILATERAL RENAL FUNCTION AND NO EVIDENCE OF OBSTRUCTION.

Ex. 36. On June 23, 1999, Defendant Arteaga reviewed the IVP.Ex. 33.

On June 16, 1999, Defendant Radi, a gastroenterologist, examined Plaintiff. Ex. 29. Plaintiff complained to Defendant Radi that he had been on numerous prescriptions for GERD and hiatal hernia; that he had "confusion" side effects from Tagamet; that he could not raise his arms when he was on Zantac; and, that Pepcid did not help him. *Id.* He requested a laparoscopic hiatal hernia repair. *Id.* Defendant Radi described the examination as "essentially unremarkable." *Id.* He wrote that Plaintiff "may have GERD." *Id.* He noted Plaintiff's complaints of allergies to Prilosec, Pepcid, Zantac, Tagamet, and Propulsid and recommended an allergy evaluation and a psychiatric evaluation. *Id.* On June 17, 1999, Defendant Consuegra reviewed Defendant Radi's report. *Id.*; Ex. 32. Defendant Consuegra approved the allergy and psychiatric consultation requests. Ex. 30; Ex. 31.

On June 23, 1999, Psychological Specialist Herrera–Rivera interviewed Plaintiff, who complained about numerous medical problems. Ex. 35. Plaintiff told the psychological specialist that he was experiencing visual hallucinations, such as spiders and things that make his body feel "weird." *Id.* The specialist noted that, during the interview, Plaintiff showed him "numerous reports about medication side-

effects, indicating that he is presenting all the symptoms mentioned in every one of the medication side-effects brochures." *Id.* The psychological specialist recommended evaluation for psychotropic medication and diagnosed "rule out somatization disorder."[7] *Id.*

That same day, Defendant Arteaga examined Plaintiff Jones in the General Medical Clinic, noting the same small kidney stone on the left side with no obstruction. Ex. 37. He further documented that Plaintiff was asymptomatic, but was still complaining of loose stool. *Id.* His medications, at that time, were Maalox, Chlorpheniramine (an antihistamine) and Tylenol as needed. *Id.*

On June 30, 1999, M. Francis, a psychiatrist, examined Plaintiff Jones. Ex. 39. Plaintiff reported that he had stopped all his stomach medications and was feeling fine, not confused and "no longer sees or feels bugs crawling on his body." *Id.* Plaintiff denied audio or visual hallucinations and refused psychotropic medication. *Id.* Dr. Francis recommended a relaxation program and further gastrointestinal testing. *Id.*

On July 16, 1999, Defendant Arteaga reviewed Plaintiff's medications and prescribed Chlortrimitron, Tylenol, Procto-Cream and Afrin Nasal Spray. Ex. 42. On July 26 and 29, Plaintiff complained to the confinement nurse about diarrhea, hemorrhoids and dandruff and was given dandruff shampoo and suppositories and referred to a medical doctor. Ex. 44; Ex. 45. On August 2, 1999, Plaintiff Jones was examined by Dr. Arteaga in the Doctors Clinic. Ex. 45. Defendant Arteaga diagnosed external hemorrhoids, represcribed the Anusol–HC suppository, ProctoCream, Afrin Nasal Spray and Tylenol and ordered a gastroenterology consultation. *Id.*

That same day, Defendant Arteaga filled out a consultation request for Plaintiff Jones to be seen in general surgery at the North Florida Reception Center for evaluation for a possible hemorrhoidectomy. Ex. 46. He noted that Plaintiff's hemorrhoids were bleeding, even though he had been treated with Anusol–HC suppository and ProctoCream for the past three months. *Id.*

On August 16, 1999, Defendant Arteaga again examined Plaintiff in the Doctors Clinic, due to Plaintiff's complaints of bloody stool. Ex. 53. Defendant Arteaga diagnosed GERD and external hemorrhoids and ordered a stool occult blood test. *Id.* Plaintiff refused Dicyclomine (also called Bentyl—used to relieve spasms of the stomach and intestines) on August 18, 1999. Ex. 53; Ex. 54; Ex. 55. Defendant Arteaga reviewed the laboratory work on August 24, 1999, and it was negative for blood. Ex. 56.

On August 27, 1999, Dr. Richardson, M.D., saw Plaintiff and diagnosed external hemorrhoids, but observed no blood. Ex. 58. He recommended a hemocult and, if positive, a colonoscopy. *Id.* On August 30, Defendant Arteaga reviewed Dr. Richardson's report. Ex. 59. Nurse Taylor collected Plaintiff's stool sample on September 7 (Ex. 60), and the results were reported as "negative" on November 17, 1999. Ex. 77; Ex. 78.

That same day, Plaintiff complained to the nurse in confinement sick call of sneezing and shortness of breath, GERD and chest, shoulders, neck and facial redness in the evening hours. Ex. 61. Defendant Arteaga reviewed his chart and filled out an ear, nose, and throat consultation on September 20, 1999. Ex. 62; Ex. 63. Because of Plaintiff's complaints of problems

---

7. Somatization is the process by which psychological distress is expressed as physical symptoms. *See* http://www.medterms.com.

breathing through his nose, Defendant Arteaga requested evaluation of the old nose fracture. Ex. 63. Defendant Arteaga prescribed Claritin on September 24, 1999. Ex. 64. The medical records reflect ongoing medical complaints and continuing medical treatments, medications and consultations during this time frame.

On October 25, 1999, Plaintiff was examined by Dr. Laucks for his nose problem. Ex. 71; Ex. 72. Dr. Laucks diagnosed "mild congestion in the nasal cavity." Ex. 72. He recommended Beconase Nasal Spray (which had already been prescribed for him at BCI). *Id.* Dr. Laucks indicated no follow-up was needed in the E.N.T. clinic unless Plaintiff reported new medical complaints. *Id.*

On October 26, 1999, Defendant Arteaga reviewed the consultation and prescribed the nasal spray. Ex. 73. On November 3, 1999, Plaintiff was seen again by a nurse with a multitude of medical complaints, including kidney pain. Ex. 75. On November 5, 1999, Defendant Arteaga ordered Vancenase nasal spray. Ex. 76. Based on Plaintiff's complaints of November 17, 1999, Defendant Arteaga scheduled him for another surgery consultation with Dr. Richardson. Ex. 77; Ex. 78.

On November 22, 1999, Defendant Consuegra met with Plaintiff Jones regarding his medical problems. Ex. 80. Defendant Consuegra requested an urgent urology consult due to Plaintiff's complaints of blood in his urine and "occasional left abdominal pain." Ex. 79.

On November 29, 1999, Dr. Abramson, a urologist at North Florida Reception Center, examined Plaintiff Jones. Ex. 82. He reviewed the IVP performed in June and made note of the five millimeter calculi in Plaintiff's left kidney. *Id.* According to a KUB (kidney, ureter, bladder) x-ray performed that same day, the kidney stone remained unchanged since the earlier studies. Ex. 83. Dr. Abramson's recommendation was for an ESWL (extracorporeal shock wave lithotripsy)[8] of the left kidney. Ex. 82. Defendant Arteaga reviewed Dr. Abramson's report the next day and ordered that the ESWL be scheduled. Ex. 84.

The surgery consultation that Defendant Arteaga ordered on November 17, 1999, took place on December 17, 1999. Ex. 89. Dr. Charles Richardson, M.D., found "no significant exterior tags or hemorrhoids." *Id.* The hemocult was negative, and Dr. Richardson identified no rectal pathology. *Id.* He recommended a barium enema only if symptoms persisted. *Id.* He noted that Plaintiff did not need a follow-up appointment. *Id.*

On December 20, 1999, Defendant Arteaga reviewed the report and ordered a barium enema. Ex 89; Ex. 90. The barium enema preparation occurred on January 4 and 5, 2000. Ex. 92; Ex. 93. Plaintiff was transported to North Florida Reception Center for the x-ray of the barium enema. Ex. 93.

On January 12, 2000, Plaintiff Jones was transferred to North Florida Reception Center, prior to his transfer to Memorial Hospital Jacksonville for the ESWL. Ex. 98; Ex. 101; Ex. 102. Plaintiff was returned to North Florida Reception Center following the ESWL. Ex. 104. He complained of right lower quadrant pain. *Id.* Plaintiff later passed the remains of the kidney stone.[9] *Id.*

---

8. This method is a less invasive procedure to break up a kidney stone; the technique shatters the kidney stone with a shock wave produced outside the body. *See* http://www.medterms.com.

9. Inmate Jerry W. Jones, in an unnotarized affidavit with no original signature, described Plaintiff's pain in passing the remains of the kidney stone. Plaintiff's Composite W 3.

On January 21, 2000, the barium enema was determined to be within normal limits by Dr. Hac Nguyen at North Florida Reception Center. Ex. 108. On January 31, 2000, Dr. Abramson, the urologist at North Florida Reception Center, wrote his post-ESWL report. Ex. 111. He noted that Plaintiff "passed several fragments." *Id.* He further documented that Plaintiff continued to complain of pain on the right side, but that the IVP performed in June 1999 revealed no pathology on the right. *Id.* He also noted that another KUB x-ray performed that same day revealed no kidney stones. *Id.;* Ex. 112. He recommended that the stone be sent out for analysis. Ex. 111. Plaintiff was returned to BCI on February 11, 2000. Ex. 115.

On February 17, 2000, Defendant Arteaga reviewed the laboratory work on the kidney stone, which revealed that it was composed of calcium. Ex. 119. On February 22, 2000, Defendant Arteaga examined Plaintiff in the General Medicine Clinic. Ex. 120. Plaintiff continued to complain and stated that no medications helped him. *Id.* Defendant Arteaga ordered another consultation with Defendant Radi, a gastroenterologist. *Id.;* Ex. 122. Defendant Arteaga also noted, in his consultation request, that Plaintiff was "asymptomatic." Ex. 122.

On March 28, 2000, Plaintiff was transported to North Florida Reception Center for the gastroenterological consultation requested by Dr. Arteaga. Ex. 129. Plaintiff complained to Defendant Radi that he had allergies to acid blocks and needed something for his agony and pain. Ex. 130. He also complained of intermittent diarrhea, constipation and colon pain. *Id.* Defendant Radi diagnosed probable GERD and psychosomatic symptoms. *Id.* He recommended Prevacid. *Id.* Plaintiff was upset during the consultation because he had not been sent for laparoscopic surgery. *Id.* He told Defendant Radi that he

was "going to contact his attorney because he was going to resist us using PPI [Proton Pump Inhibitor—a gastrointestinal medication]." *Id.* Defendant Radi explained to Plaintiff that Prevacid is a PPI and also recommended continued psychological evaluation. *Id.* Defendant Arteaga reviewed Dr. Radi's report the next day. Ex. 131.

On April 3, 1999, Defendant Arteaga examined Plaintiff, who complained about abdominal cramps and black stool, and Defendant Arteaga diagnosed colitis (inflammation of the large intestine), prescribed Donnatal (an antispasmodic) and ordered that another fecal occult blood test be given. Ex. 132; Cherry's Affidavit. Plaintiff's laboratory work was reported as "okay" on May 17, 1999. Ex. 140.

On April 28, 2000, Defendant Arteaga examined Plaintiff Jones in the Doctors Clinic, and Plaintiff complained of cramps and diarrhea and stated he could not tolerate the Prevacid. Ex. 137. In response, Defendant Arteaga prescribed Imodium and Donnatal and discontinued the Prevacid. *Id.*

On May 4, 2000, Nurse Godwin saw Plaintiff in the confinement sick call, and Plaintiff complained that he needed an internal hemorrhoidal cream, not an external cream. Ex. 139. Plaintiff also expressed dissatisfaction with the nasal spray, which had been prescribed, and signed a refusal. *Id.* Plaintiff requested Nizoral instead. *Id.* The same day, Defendant Arteaga noted that Plaintiff Jones had signed the refusal, and he prescribed the requested Nizoral. Ex. 140. On May 17, 2000, Defendant Arteaga reviewed Plaintiff's laboratory work and noted that it was "ok." *Id.* He reviewed Plaintiff's chart for complaints on June 1, 2000, and continued the Imodium. *Id.*

On June 20, 2000, Defendant Consuegra examined Plaintiff Jones at the Doctors

Clinic. Ex. 149. Plaintiff had requested that he be taken off of Claritin because of urinary retention. *Id.* Defendant Consuegra noted that Plaintiff had a normal physical, and he diagnosed possible personality disorder. *Id.* He discontinued the Claritin and prescribed Chlorpheniramine (an antihistamine). *Id.*

On June 29, 2000, Defendant Le examined Plaintiff Jones in the Doctors Clinic. Ex. 154. At that time, Plaintiff Jones had no complaints of diarrhea. *Id.* He did complain that he was allergic to prescriptions for GERD, including Bentyl (Dicyclomine), Tagamet, Zantac, Reglan, Prilosec, Pepcid and Propulcid. *Id.* He talked about medical literature stating he may have kidney stones and allergies to acid blockers. Ex. 154; Ex. 155. Defendant Le diagnosed that the diarrhea was resolved. Ex. 155. He advised Plaintiff to continue the psychological counseling and not to lie down right after meals. *Id.*

The record clearly demonstrates that Plaintiff Roger Lee Jones was seen routinely by either the named Defendants or nurses employed by the Department of Corrections and that he was treated for his medical complaints, regardless of the severity of the alleged medical problem or issue. The medical records and grievances show that the medical staff adequately addressed his ongoing medical complaints and treated his continuing medical problems.

Several medical personnel noted Plaintiff's hypochondriacal tendencies and his constant complaints of allergies to numerous medications. However, their comments did not negatively affect the medical attention and treatment he was provided on almost a daily basis during the relevant time period. Defendant Radi recommended a psychiatric evaluation because of Plaintiff's complaints of "confusion" as a side effect of Tagamet and because Plaintiff's examination was unremarkable. Ex.

29. Soon after, Psychological Specialist Herrera–Rivera recommended evaluation for psychotropic medication and diagnosed Plaintiff with possible hypochondria. Ex. 35. And, later, Defendant Radi diagnosed psychosomatic symptoms and recommended continued psychological evaluation. Ex. 130; Ex. 131. About three months later, Defendant Consuegra examined Plaintiff and diagnosed a possible personality disorder because of Plaintiff's complaints of side effects and because his physical was normal. Ex. 149.

█ First, this Court must determine whether Plaintiff's medical needs were "serious" medical needs. A serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1187 (11th Cir.1994) (citation omitted). In either of these situations, the medical need must be "one that, if left unattended, 'pos[es] a substantial risk of serious harm.'" *Taylor,* 221 F.3d at 1258 (alteration in original) (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811). Based on the medical records and the attention given to Plaintiff's medical needs during the relevant time period, this Court concludes that Plaintiff's kidney and gastroenterological concerns were serious medical issues.

█ Even assuming that Plaintiff's medical complaints and concerns were "serious," the Defendants were not deliberately indifferent to any "serious" medical needs. Quite to the contrary, the chronology of his medical evaluations and treatments reflects that the Defendants were concerned about his medical ailments and issues and responded to his medical complaints in a timely fashion. *See* Cherry's Affidavit; Kolts' Affidavit. While

Plaintiff's complaints were ongoing, the Defendants were also responding with continuing treatments that seem to promptly resolve his medical concerns. While it is unfortunate that any inmate would have such continuing medical complaints and such a variety of medical issues for resolution, the record reflects that the Defendants were responsive and timely when addressing Plaintiff's medical concerns.

Further, while Plaintiff may disagree with many of the medical decisions made by the Defendants with respect to his complaints, it is clear that "a difference of opinion over matters of medical judgment does not give rise to a constitutional claim." *Tedesco v. Johnson*, 119 F.Supp.2d 1320, 1327 (M.D.Fla.2000) (citing *Massey v. Hutto*, 545 F.2d 45 (8th Cir.1976)). And, further, the responses to the multitude of grievances reflect that the prison officials kept Plaintiff apprised of the status of his medical treatment and informed him that the courses of medical treatment would be made by the attending physician. Finally, a complaint that a physician or medical technician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. *Estelle*, 429 U.S. at 106, 97 S.Ct. 285.

## B. Qualified Immunity

Defendant Radi contends that he is entitled to qualified immunity from damages. The Eleventh Circuit has reviewed the qualified immunity principles.

> "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly estab-

lished statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez*, 325 F.3d at 1232 (quoting *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002)); *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002). To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority. *Gonzalez*, 325 F.3d at 1233 (citing *Vinyard*, 311 F.3d at 1346).

*Cottone v. Jenne*, 326 F.3d 1352, 1357–58 (11th Cir.2003); *Ray v. Foltz*, 370 F.3d 1079, 1081–82 (11th Cir.2004).

■ In this case, Defendant Radi was acting within his discretionary authority.[10] *See Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1267 n. 13 (11th Cir.2003); *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002); *Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1185 n. 17 (11th Cir.1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority.").

Thus, once the Defendant has established that he was acting within his discretionary authority, the burden then shifts to the Plaintiff to show that the Defendant is *not* entitled to qualified immunity. The Supreme Court has established a two-part test to determine the applicability of qualified immunity.

> "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope*, 122 S.Ct. at 2513. If, under the plaintiff's allegations, the defendants

10. A private physician under contract with the State to provide medical care to inmates acts "under color of state law," for purposes of Section 1983, when undertaking his duties to treat an inmate. *Farrow v. West,* 320 F.3d 1235, 1239 n. 3 (11th Cir.2003) (citations omitted).

would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

*Vinyard v. Wilson*, 311 F.3d at 1348; *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir.2004) (stating that a court reviewing a claim of qualified immunity must first determine whether plaintiff has alleged the deprivation of a constitutional right, and if so, then proceed to determine whether that right was clearly established at the time of the alleged violation); *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir.2003), *cert. denied*, — U.S. —, 124 S.Ct. 1655, 158 L.Ed.2d 355 (2004).

█ Based on the undisputed facts presented in the record before this Court, Defendant Radi has not violated Plaintiff's Eighth Amendment right. Thus, "there is no need to proceed to the next step of determining if a constitutional right was clearly established." *Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1298 n. 16 (11th Cir.2003); *Lumley v. City of Dade City, Fla.*, 327 F.3d 1186, 1194 (11th Cir. 2003). It is clear that Defendant Radi is entitled to qualified immunity.

Therefore, for the above-stated reasons, Defendants' Motions for Summary Judgment and the Motion to Dismiss, construed as a motion for summary judgment, will be granted and judgment will be entered in Defendants' favor.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1. Defendants Arteaga, Porterfield, Le, Bowlan, Estate of Edguardo A. Consuegra, and Nguyen's Motion for Summary Judgment (Doc. # 83) is **GRANTED**.

2. Defendant Radi's Motion for Summary Judgment (Doc. # 124) is **GRANTED.**

3. Defendants Juan Carlos Consuegra and/or Mireya Consuegra, Executrix and/or Administrator of the Estate of Edguardo A. Consuegra's Motion to Dismiss the Third Amended Complaint (Doc. # 129), construed as a motion for summary judgment, is **GRANTED**. Their request to adopt Defendants' Motion for Summary Judgment (Doc. # 83) is also **GRANTED**.

4. Plaintiff's Motion to Accept State Jurisdiction (Doc. # 179) is **DENIED.**

5. Plaintiff's Motions for Enlargement of Time (Docs.# 181, 184) are **GRANTED** only to the extent that Plaintiff's Response and Objection to the Defendants' Motion for Summary Judgment (Doc. # 185) and Memorandum (Doc. # 186) with supporting documentation are accepted as timely filed.

6. The Clerk shall enter judgment in favor of Defendants Edguardo A. Consuegra's Estate; Diogenes A. Arteaga, M.D.; Chuong Le, M.D.; Canh T. Nguyen, M.D.; Barbara Ann Porterfield; Alejandro Radi, M.D.; and, C.B. Bowlan.

7. The Clerk shall close this case.