[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 24, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-12500

_____

D.C. Docket No. 03-00086-CV-J-20-HTS

GRACE RAY, as parent and next friend of R.M.,
a minor, EARL RAY, as parent and next friend
of R.M., a minor,

Plaintiffs-Appellees,

versus

E. J. FOLTZ, individually, DEBORAH JONES,
individually, NANCY CORLEY, individually,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(MAY 24, 2004)

Before TJOFLAT and HILL, Circuit Judges, and MILLS[*], District Judge.

---

[*] Honorable Richard Mills, United States District Judge for the Central District of
Illinois, sitting by designation.

HILL, Circuit Judge:

Grace Ray and Earl Ray, as parents and next friends of R.M., a minor, filed a complaint in district court under 42 U.S.C. 1983, alleging that E.J. Foltz, Deborah Jones, and Nancy Corley violated R.M.'s substantive due process right to physical safety as a dependent child in the custody of the Florida Department of Children and Families. The defendants filed a motion to dismiss based upon qualified immunity, which the district court denied. Defendants timely filed this appeal.

I.

E.J. Foltz, Deborah Jones, and Nancy Corley were employed in the licensing unit of the Florida Department of Children and Families (the "Department") at all times relevant to this action. Each was involved in the assessment, screening and evaluation of foster homes during this time. Each was also directly involved with the licensing of Keith and Lena Cumberbatch to provide foster care in their home.

On February 21, 2001, the Department placed R.M., a three-year-old child, and his ten-month-old sister, Latiana, in the Cumberbatch foster home. R.M. was

2

thereafter neglected and abused in the Cumberbatch home. Five months after R.M. and Latiana's placement in the Cumberbatch home, Latiana was murdered by Lena Cumberbatch.

It is important to note at the outset that none of these defendants is accused of personally inflicting any injury upon R.M. The person who abused R.M. is in prison for life.[1]

Grace Ray and Earl Ray, however, claim that these defendants could have and should have prevented this tragedy from happening. The gravamen of the Rays' complaint is that the defendants violated certain Department guidelines and procedures in licensing the Cumberbatch home, which both allowed R.M. to be placed in a "dangerous environment for foster children," and aggravated the likelihood that he would be abused there. Although none of these allegations has been proven, we shall assume that they are true for the purpose of deciding whether defendants must answer in court to the Rays' claim. *See GJR Investments, Inc. v. County of Escambia,* 132 F.3d 1359, 1367 (11th Cir. 1998).

II.

---

[1] Lena Cumberbatch was convicted of Latiana's murder and is now serving a life sentence in prison.

These defendants might be required to answer in court to the Rays' charges, even if they did not personally injure R.M. If the Rays claimed that the defendants actually knew that R.M. was being abused and were deliberately indifferent to it – did nothing about it – we would require them to answer this claim in court.

But this is not what the Rays claim. While they claim that defendants did nothing about the abuse of R.M., they make no claim that the defendants actually knew about it. The Rays allege only that the defendants failed to gather certain information as required by the Department that might have alerted them to the risk of harm to R.M., and that they failed to follow certain other guidelines and procedures that might have prevented his injuries. Essentially, the Rays claim is that the defendants *should have known* about the risk of harm to R.M. Under this circumstance, the defendants maintain that, as state employees required to take discretionary actions in the performance of their duties, they are immune from this action.

II      *The Qualified Immunity Defense*

When government officials act in a way that knowingly violates a clearly established statutory or constitutional right of which a reasonable person would have known, they are not immune from suit and may be held liable for the damage

4

their actions caused. *Harlow v. Fitzgerald,* 457 U.S. 800, 818-19 (1982). But when these same officials make decisions that do not knowingly violate such rights, they are not required to defend themselves in a lawsuit seeking damages. *Id.* They are "immune" from suit. *Id.* We call this defense "qualified immunity" because the official is immune from a damage lawsuit, qualified upon his ability to show that he did not knowingly violate the plaintiff's clearly established constitutional right. *Id.*

The United States Supreme Court has said that this defense serves important public policies. *Richardson v. McKnight,* 521 U.S. 399, 408-11(1997). The Court has described the doctrine's purposes as protecting "government's ability to perform its traditional functions by providing immunity where necessary to preserve the ability of government officials to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service." *Id.* at 408 (internal quotations omitted). The Court noted that the threat of being sued would "dampen the ardor of all but the most resolute, or the most irresponsible public officials." *Id.* (internal quotations omitted). The grant of such a defense, according to the Court, is to encourage competent and responsible people to enter government service. *Id.* It is precisely these people,

5

not the irresponsible and careless, who would be deterred from government service by the fear of being sued.

It is for this reason that the doctrine provides immunity from suit, not just a defense that may be raised at trial. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). One of the purposes of qualified immunity is to protect public officials from the demands of defending oneself at trial. *Id.*

Because of these important, even critical, public policies underlying the defense of qualified immunity, the Supreme Court has indicated that all but the plainly incompetent and those who *knowingly* violate the law are shielded from lawsuits. *Malley v. Briggs,* 475 U.S. 335, 341 (1986). We have acknowledged these concerns by recognizing that "courts should think long and hard before stripping defendants of immunity." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir. 1994). We turn now to our consideration of whether these defendants are entitled to immunity from this lawsuit.

II.    *The Defense As Applied to this Case*

1.    R.M.'s  clearly established right to physical safety in his foster home

It is clearly established in this circuit that foster children have a constitutional right to be free from unnecessary pain and a fundamental right to

physical safety. *Taylor v. Ledbetter*, 818 F.2d 791, 794-95 (11th Cir. 1987) (en banc). The state's action in assuming the responsibility of finding and keeping the child in a safe environment places an obligation on state officials to ensure the continuing safety of that environment. *Id.* The failure to meet that obligation constitutes a deprivation of liberty under the fourteenth amendment. *Id*.

We reject defendants' argument that "*Taylor* merely generally establishes that a foster child's constitutional rights may be violated," while not making it "apparent that any *specific* conduct violates a foster child's constitutional rights." Even were the facts of *Taylor* not substantially similar to those here, *see Hope v. Pelzer*, 536 U.S. 730 (2002), *Taylor* clearly established that foster children have a liberty interest, pursuant to the substantive due process clause of the fourteenth amendment, in being free from the type of abuse inflicted upon R.M. Although R.M. was not reduced to a coma as was the child in *Taylor*, his injuries were sufficiently similar that no reasonable argument can be made that *Taylor* did not put defendants on notice that deliberate indifference to the risk of this harm would subject them to potential liability. *See also Omar v. Lindsey*, 243 F. Supp. 2d

1339, 1344-45 (M.D. Fla. 2003) *aff'd on basis of district court opinion*, 334 F.3d 1246 (11th Cir. 2003).[2]

Thus, there can be no question under the facts alleged, that the injuries sustained by R.M. violated his well-established constitutional right in this circuit to be reasonably safe in his foster home. Nevertheless, the Rays cannot proceed upon this allegation alone. The law also requires that the Rays be able to claim that the defendants were *deliberately indifferent* to the violation of this right. *Taylor*, 818 F.2d at 797. The remaining question, then, is whether the Rays have made this claim. [3]

 2.  <u>Deliberate Indifference to R.M.'s Constitutional Right to Safety</u>

Defendants are not subject to this damage suit unless they were deliberately indifferent to R.M.'s right to be reasonably safe. *Taylor*, 818 F.2d at 797. "Only

---

[2] Nor do we agree with defendants that this complaint suffers from the "shotgun" style of pleading which we have condemned for making allegations that defendants engaged in certain unconstitutional conduct without making distinctions among the defendants charged. *Magluta v. Samples*, 256 F.3d 1282, 1283 (11th Cir. 2001). A fair reading of R.M.'s complaint sufficiently informs defendants of the alleged constitutional deprivation. As we have previously said, "[t]he fact that defendants are accused collectively does not render the complaint deficient" where "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct." *Kyle v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000).

[3] R.M. does not appear to contest that defendants were acting within the scope of their discretionary authority, the second requirement for the assertion of the defense. *See Courson v. MacMillan*, 939 F.2d 1479, 1487 (11th Cir. 1991).

where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child will liability be imposed." *Id.*

Deliberate indifference is not the same thing as negligence or carelessness. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). On the contrary, the Supreme Court has made clear that a state official acts with deliberate indifference only when he disregards a risk of harm of which he is *actually aware*. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (to be deliberately indifferent a state "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*") (emphasis added). Defendants, then, cannot be liable to the Rays unless they both *knew* of and *disregarded* an excessive risk of abuse to R.M. *Id.*

Following this guidance, we have stated that in order to establish deliberate indifference, plaintiffs must be able to allege (and prove at trial) that the defendant (1) was objectively aware of a risk of serious harm; (2) recklessly disregarded the risk of harm; and (3) this conduct was more than merely negligent. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). As we said in *Taylor*, "[a] child abused while in foster care . . . [is] faced with the difficult problem of showing

9

*actual knowledge* of abuse or that agency personnel *deliberately failed to learn* what was occurring in the foster home." 818 F.2d at 796 (emphasis added). We must now look at the Rays' complaint to see if they have claimed that the defendants had actual knowledge or deliberately failed to learn of the serious risk to R.M. of the sort of injuries he ultimately sustained.

First, the Rays claim that the defendants failed to take various actions that, if taken, would have led to the discovery of adverse information about the Cumberbatches and their fitness to serve as foster parents.[4] These allegations, however, even if true, which we assume, do not show that the defendants had *actual knowledge* of a substantial risk of harm to R.M. In fact, the allegations show that the defendants were ignorant of certain risks that the information may have revealed. Nor do the Rays claim that the defendants *deliberately* failed to gather this information. At most, their claim is that the defendants were negligent or careless in not gathering the information, or that they negligently or carelessly failed to follow Department guidelines.

---

[4] R.M. alleges that the defendants failed (1) to obtain all information from the state of Michigan concerning the Cumberbatches' history as foster parents in Michigan; (2) to obtain a completed foster parent application from the Cumberbatches; (3) to require the Cumberbatches to undergo certain training during which additional background information about them may have been discovered.

Second, R.M. alleges that the defendants ignored certain adverse information about the Cumberbatches and their fitness to serve as foster parents.[5] As with the foregoing allegations, we are unable to conclude from these allegations that defendants knew of a substantial risk of harm to R.M. In fact, there is not even an allegation here that defendants even *knew* of these incidences, much less that they inferred from them that R.M. was in grave danger. *Farmer*, 511 U.S. at 836-37 (to be deliberately indifferent, and "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

Nor is there any specific information accompanying these allegations from which we might conclude that they, if known, would have alerted defendants to a serious risk to R.M. For example, the most serious of these allegations is that within days of his placement in the Cumberbatches' home, R.M. began showing signs of abuse and neglect, which included bruises, blisters, and rashes. There is, however, no claim that any of these defendants knew of these problems, or even

---

[5] The Rays allege that the defendants ignored (1) two 1999 abuse reports regarding Keith Cumberbatch; (2) statements that the Cumberbatches failed to provide proper care to a small child in their home; (3) complaints that the Cumberbatches were verbally abusive and uncooperative with state officials; (4) bruises, blisters, and rashes on R.M.; (5) the removal of a foster child from the Cumberbatches' home because they were uncooperative; and (6) the fact that R.M. was not in day care for weeks.

any specific support for the allegation that they were the product of abuse. In the absence of allegations that defendants knew of these problems, we cannot conclude that the defendants were deliberately indifferent to them. *Id.*

Finally, the Rays' claim that the defendants failed to require the Cumberbatches to complete certain training that might have produced more information about them and violated Department rules by placing too many children in that home.[6] Like many of the foregoing allegations, the gravamen of these claims is that the defendants violated Department guidelines and established procedures in granting a foster home license to the Cumberbatches. Under the law, however, such allegations do not support the Rays' claim for monetary damages. In *Taylor*, we made clear that allegations that foster care officials have not followed guidelines set forth by their Department state a claim for violation of one's right to procedural due process. 818 F.2d at 798-800.[7] We said then:

> Thus, the Georgia scheme mandates that officials follow guidelines and take affirmative actions to ensure the well being and promote the welfare of children in foster care. These children can state a claim based upon deprivation of a liberty interest in personal safety when

---

[6] R.M. alleges many other violations of state guidelines and practices and procedures with respect to defendants' failure to obtain information.

[7] We held there that the Georgia foster care statutes and regulations created a constitutional due process right to certain procedures, such as a pre-placement investigation and subsequent supervision of the foster home. *Id.* at 799.

> the officials fail to follow this mandate. . . . [The child] is entitled to be protected in the manner provided by the statute.

*Id.* at 799-800.

Allegations of failure to follow state policies and procedures, however, do not support a claim for damages, such as the Rays'. *Taylor*, 818 F.2d at 800.[8] Where damages are sought, more must be shown than negligent failure to follow Department guidelines and procedures.[9] The Rays must be able to allege that the defendants had actual knowledge that R.M. was being abused (or at substantial risk of being abused) or that they deliberately chose not to learn of the abuse. In the absence of such allegations, the Rays have not stated a claim under Section 1983.[10]

---

[8] Such a claim can result only in the grant of the procedures due. *See Taylor*, 818 F.2d at 822 (Tjoflat, J. concurring in part and dissenting in part) ("[T]he remedy for a procedural due process violation is restoration of the status quo ante and an injunction barring deprivation of the plaintiff's rights without the requisite procedural protections . . . . The plaintiff does not seek this type of remedy, and it would not make sense for her to do so, because predeprivation notice and a hearing would not provide the money damages she seeks for the injury her foster parents inflicted") (citations omitted).

[9] Indeed, the Rays' claims that "the foster care system was dangerously over-capacity" resulting in the "routine practice of placing children in overcrowded foster homes essentially negate any inference that the defendants in this case *deliberately* failed in their duties to R.M. On the contrary, the Rays' claim appears to be that an *institutional* failure contributed to R.M.'s injuries.

[10] Appellants' Motion to Strike Portions of Appellees' Brief, carried with the case, is granted.

## III.

As we said above, R.M.'s abuse saddens and repulses us.  The criminal justice system has already dealt with his tormentor.  His parents seeks damages from the defendants for their part in this tragedy.  This is understandable.  They cannot recover, however, unless they can show that the defendants actually knew of the substantial risk of harm to R.M. and that they were deliberately indifferent to it.  This they have not done.

Accordingly, the judgment of the district court is REVERSED, and the case is REMANDED to the district court with instructions to DISMISS.