**Grace RAY and Earl Ray as parents and next friends of R.M., a minor, Plaintiffs,**

v.

**E.J. FOLTZ, individually, Deborah Jones, individually, Nancy Corley, individually, Leslie Chipman Brown, individually, and Barbara Jones a/k/a Barbara Young, individually, Defendants.**

No. 3:03–CV–86–J–20MCR.

United States District Court,
M.D. Florida,
Jacksonville Division.

Jan. 21, 2005.

Howard M. Talenfeld, Colodny, Fass & Talenfeld, P.A., Ft. Lauderdale, FL, Robert F. Spohrer, Helen W. Spohrer, Spohrer, Wilner, Maxwell & Matthews, P.A., Jacksonville, FL, for Plaintiffs.

John F. Dickinson, J. Ray Poole, Jr., Constangy, Brooks & Smith, LLC, J. Dix-

on Bridgers, III, Vernis & Bowling, Jacksonville, FL, for Defendants.

## ORDER

SCHLESINGER, District Judge.

Before the Court are Motions to Dismiss filed by all Defendants. Specifically before the Court is Defendant Brown's Motion to Dismiss (Doc. No. 78, filed October 16.2004) and Plaintiffs' Response (Doc. No. 86, filed November 5, 2004), Defendant Barbara Jones' Motion to Dismiss (Doc. No. 80, filed October 16.2004) and Plaintiffs' Response (Doc. No. 85, filed November 5.2004). Additionally, Motions to Dismiss have been filed by Defendant E.J. Foltz (Doc. No. 87. filed December 6.2004) and by Defendants Nancy Corley and Deborah Jones (Doc. No. 89, filed December 10, 2004). Plaintiffs responded to both Motions (Doc. Nos. 95 & 96, filed January 7, 2005).

### Factual Background

Generally, this case involves the tragic circumstances that lead to the injury of three-year-old R.M. and the death of his one-year-old sister Latiana. In September 2000, R.M. and Latiana were placed in the Rose Joyner foster home. On February 21, 2001, the Department, specifically Defendant Barbara Jones, removed R.M. and Latiana from the Joyner home and placed them in the Cumberbatch home. It is undisputed that subsequent to this placement, both children were neglected and abused. Five months after the placement, Lena Cumberbatch murdered Latiana. It is also alleged that R.M. suffered abuse, including sexual abuse, at the hands of

another foster child, while in the care of Ms. Joyner.

While Mrs. Cumberbatch has been criminally punished,[1] Plaintiffs seek to recover civilly from Defendants. All Defendants were employed by the Florida Department of Children and Family Services ("Department") during the relevant time. Each was involved, to some extent, in the assessment, screening, and evaluation of foster homes, or was directly involved in the placement of R.M. in the Joyner and Cumberbatch homes.

### Standard of Review

In deciding a Defendant's motion to dismiss, the Court must view the complaint in the light most favorable to the plaintiff. *See e.g., Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A complaint should not be dismissed for failure to state a cause of action "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir.1991). Where no construction of the factual allegations will support the cause of action, however, the Court may dismiss the complaint as a matter of law. *Marshall County Board of Education v. Marshall County Gas District,* 992 F.2d 1171, 1174 (11th Cir.1993).

The Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley,* 355 U.S. at 47, 78 S.Ct. 99. All that is required is "a short and plain statement of the claim." Fed.

---

1. Lena Cumberbatch was convicted of Latiana's murder and is now serving a life sentence.

R.Civ.P. 8(a)(2). The Federal Rules have adopted this simplified pleading approach because of "the liberal opportunity for discovery and other pretrial procedures ... to disclose more precisely the basis of both claim and defense ...." *Conley*, 355 U.S. at 47–48, 78 S.Ct. 99. The purpose of notice pleading is to reach a decision on the merits and avoid turning pleading into "a game of skill in which one misstep by counsel may be decisive to the outcome." *Id.* at 48, 78 S.Ct. 99.

### Analysis

Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 and allege violations of R.M.'s Fourteenth Amendment interest to be safe from unreasonable risk of harm while in state custody. Defendants argue that Plaintiffs have failed to state a § 1983 claim because they have not sufficiently alleged deliberate indifference on the part of Defendants. Defendants also assert a defense of qualified immunity.

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir.2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 731, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). The Eleventh Circuit has further elaborated on this standard and has held:

> [f]or qualified immunity to be surrendered, preexisting law must dictate, that is truly compel, (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.

*Lassiter v. Ala. A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir.1994)(en banc). Essentially, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). It is a plaintiff's burden to show that defendant's actions violated clearly established law. *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir.1983). The Eleventh Circuit has pointed out that a plaintiff does not met his burden by merely stating a constitutional claim using the most general terms. *See Dartland*, 866 F.2d at 1323 (quoting *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986)).

In order to determine the applicability of qualified immunity, the Supreme Court has established a two-part inquiry. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, the Court must consider whether the plaintiff's allegations, taken as true, establish a constitutional violation. *Id.* Secondly, if such allegations do establish a constitutional violation, the Court must determine whether the right was clearly established. *Id.* at 202, 121 S.Ct. 2151.

In terms of whether Plaintiffs' allegations establish a constitutional violation, the Eleventh Circuit definitively held in 1987 that a child involuntarily placed in foster care has a Fourteenth Amendment liberty interest to be from harm and that the state has a corresponding duty to protect such children from harm. *Taylor v. Ledbetter*, 818 F.2d 791 (11th Cir.1987) (en banc). Based on the alleged facts, it is clear that the injuries suffered by R.M. "violated his well-established constitutional right ... to be reasonably safe in his foster home." *Ray v. Foltz*, 370 F.3d 1079, 1083 (11th Cir.2004). Nonetheless, in order to sustain a § 1983 claim, Plaintiffs

must also claim that each Defendant was deliberately indifferent to the violation of this right. *Id.* (quoting *Taylor*, 818 F.2d at 797).

■ "In order to establish deliberate indifference, plaintiffs must be able to allege (and prove at trial) that the defendant (1) was objectively aware of a risk of serious harm; (2) recklessly disregarded the risk of harm; and (3) this conduct was more than merely negligent." *Ray*, 370 F.3d at 1083 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir.1999)). More specifically, "[a] child abused while in foster care, will be faced with the difficult problem of showing actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home." *Id.* (quoting *Taylor*, 818 F.2d at 796).

### Defendant Leslie Chipman Brown

■ As alleged in Plaintiffs' Second Amended Complaint, Defendant Brown was employed by the Department as a family services counselor, who had the responsibility to:

(1) visit children in foster care at least monthly at the foster home and observe their interaction with their foster parents. determine the foster parents['] ability to supervise the children, check the children for signs of neglect and abuse, and assess their safety; (2) report to the District licensing staff any concerns regarding the condition of the foster home ...; (3) report to the abuse hotline any suspected abuse or neglect; (4) continually assess the adequacy and safety of a child's particular placement; (5) communicate to parties providing services to the children all known information regarding the background and

history of children ...; (6) formulate a plan of care for children who had known histories of sexual abuse or perpetration in order to establish the necessary precautions concerning a vulnerable child or one prone to victimizing others.

(Doc. No. 63, ¶ 8, August 19, 2004).

Defendant Brown argues that Plaintiffs have failed to plead facts sufficient to support a finding that Brown was deliberately indifferent to R.M.'s constitutional rights. Plaintiffs allege that R.M. experienced drastic behavior changes (including becoming withdrawn, not interacting with the other children in the home, bed wetting and urinating in inappropriate places, and sexually acting out) after being placed in the Joyner foster home, where Ms. Joyner was the head-of-the-household. According to the Second Amended Complaint. Brown was made aware of these behavioral changes by Ms. Joyner. and Brown knew that incontinence and sexually acting out were clear signs that he was suffering from sexual abuse. Yet, Brown purportedly did nothing in response. Plaintiffs also allege that Brown had knowledge that the Joyner home was grossly overcrowded. During R.M.'s placement in the Joyner home, Brown knew that up to 14 children were being housed there, some of which were allegedly victims or perpetrators of sexual abuse, with a foster mother who was suffering from extreme pain, as evidenced by her statement to a Department worker that "if I had a choice, I'd lay down and die." Allegedly, Brown knew that Ms. Joyner was incapable of supervising the many children (especially those children who had been sexually assaulted or who were themselves sexual perpetrators) based on the pain she was experiencing and the shear number of children under her care.

Plaintiffs' Second Amended Complaint also contains allegations concerning R.M.'s placement in the Cumberbatch home. A little background concerning the home and the licensing process the family went through is necessary to an understanding of the importance of Brown's inaction. According to the operative Complaint, the Cumberbatches did not fill out an application or undergo the required ten-week training seminar required of new foster parents, which includes a detailed background screening process. Nor did the Cumberbatches go through the rigors of preliminary home visits by Department staff. Instead, Plaintiffs alleged that the first time a Department employee went to the Cumberbatch house was the day the license was issued in order to get the necessary papers signed. The license was issued for one child, yet one day after issuance a waiver was signed that allowed the placement of four foster children.

R.M. and his sister were two of the four small children placed in the Cumberbatch home.

On February 27, 2001, approximately one week after R.M.'s placement in the Cumberbatch home, Brown learned of an abuse report called into the Florida Abuse Hotline. which alleged that R.M. appeared to have healing bruises that were in different stages and that resembled a cord. Although knowing about such a report, Brown purportedly did not take any action to assess R.M.'s safety and did not visit the Cumberbatch home to determine if R.M. was in need of treatment or services. Additionally, between March 2001 and April 2001, Brown was allegedly informed by Mrs. Cumberbatch that R.M. was not improving in terms of his touching himself and that his incontinence had become so severe that she had resorted to having him wear pull-ups. Plaintiffs allege that Brown knew these were clear signs of sexual abuse and. yet. Brown again took absolutely no action.

Finally, according to the operative Complaint, sometime between March 2001 and April 2001, Mrs. Cumberbatch told Defendants Brown and Barbara Jones that she was overwhelmed by the number of foster children. At the time, she had four foster children and four of her natural children living in the home. Plaintiffs also allege that, between February 2001 and July 2001, Brown was aware that Mrs. Cumberbatch had requested removal of the four, foster children in exchange for a baby, a request Brown did not investigate. The general claim is that Brown knew Mrs. Cumberbatch was incapable of properly caring for the children and that a foster child placed there was at substantial risk of serious harm based on Mrs. Cumberbatch's statements, her health (she weighed approximately 350 pounds and it is alleged that she had trouble with normal life functions, including walking, cooking, and cleaning), and given the overcrowding in the Cumberbatch home.

In summary, Plaintiffs allege that (1) Brown consistently and knowingly disregarded signs of sexual and physical abuse; (2) despite knowledge of the drastic behavioral changes in R.M., Brown failed to have him evaluated and treated (physically or mentally) or to ascertain the danger level in either the Joyner or Cumberbatch homes; and (3) Brown knew both homes were severely overcrowded and that the children could not be safely supervised by the foster parents for various reasons.

Brown argues that at best these allegations result in a finding of negligence, which is insufficient to support a § 1983 claim. The focus of Brown's argument is

that because Plaintiffs' do not allege that Brown "knew of any sexual [or physical] abuse of R.M." (Doc. No. 79, pgs. 8–9), Plaintiffs are unable to state a cause of action. Perhaps, Plaintiff is of the belief that Department workers must see the actual sexual or physical abuse taking place and ignore it before § 1983 liability applies. Such is simply not the case.

The Court pauses for a moment to consider the context within which these events took place. Children are placed into the foster care system without their consent and for their protection and safety. In so doing, the state undertakes perhaps its greatest responsibility as children, especially the very young, are often helpless and voiceless against the abuse of those under whose care they are placed. The Eleventh Circuit has likewise noted that

> Children in foster homes ... are isolated; no persons outside the home setting are present to witness or report mistreatment. The children are helpless. Without the [proper] investigation, supervision, and constant contact required by statute, a child placed in a foster home is at the mercy of the foster parents.

*Taylor,* 818 F.2d at 797. State officials should not think that by simply sticking their heads in the sand they can escape liability. The costs of doing so are just too great.

■ Defendant Brown also seems to argue for dismissal based on her assertion that causation has not been properly plead. The Second Amended Complaint alleges that as a result of "Brown's deliberate indifference, R.M., a three year old child suffered continuous physical, emotional[,] and sexual abuse" in the Joyner and Cumberbatch homes (Doc. No. 63, ¶ 129). In a

§ 1983 claim, a government official's "failure to act must have been a substantial factor leading to the violation of a constitutionally protected liberty or property interest." *Taylor,* 818 F.2d at 794.

As Plaintiffs have literally alleged causation, the Court is forced to consider whether Defendant intended to argue that she should not be considered a substantial factor leading to the injuries suffered by R.M., but merely a contributing factor. *See LaMarca v. Turner,* 995 F.2d 1526, 1538 (11th Cir.1993)(noting that in a § 1983 case the government official's actions or omissions must be a cause, not merely a contributing factor). Such an argument seems a bit disingenuous. All would agree that a person who pushes another person into a snake pit, lion den, or pool of quicksand is a proximate and substantial cause of any resulting injuries (or death) directly inflicted by the snakes, lions, or quicksand. While Brown might not have directly inflicted R.M.'s injuries, her actions/inactions carried with them an obviousness of risk. Her action/inactions were more than a mere contributing factor of the constitutional violations. As noted in *LaMarca,* the wrong in a § 1983 case "is the deliberate indifference to a constitutionally infirm condition." *Id.* at 1538–39. Here Brown could have ensured the protection of R.M.'s constitutional rights, but failed to do so. Such a failure was a proximate and substantial cause of R.M.'s injuries.

■ Based on the foregoing, Plaintiffs' allegations, taken as true, establish a constitutional violation and a § 1983 claim; likewise Plaintiffs' have met the first part of the qualified immunity inquiry. The Court now turns to the second part of the inquiry, which requires the Court to determine whether the constitutional right was

clearly established. The Eleventh Circuit has recently reconfirmed its holding in *Taylor* and has stated "[i]t is clearly established in this circuit that foster children have a constitutional right to be free from unnecessary pain and a fundamental right to physical safety." *Ray*, 370 F.3d at 1082 (citing *Taylor*, 818 F.2d at 794–5). Specifically, the court noted that R.M.'s injuries were sufficiently similar to those suffered by the plaintiff in *Taylor* that "no reasonable argument can be made that Taylor did not put defendants on notice that deliberate indifference to the risk of this harm would subject them to potential liability." *Id.* at 1082–83.

Therefore, because Plaintiffs have sufficiently plead a cause of action and because qualified immunity is inapplicable, Defendant's Motion to Dismiss (Doc. No. 78) is DENIED.

**Defendant Barbara Jones**

■ As alleged in Plaintiffs' Second Amended Complaint, Defendant Barbara Jones was employed by the Department as a placement counselor, who had the responsibility to:

(1) obtain accurate and timely written information about the background of children she was placing in a foster home as well as the background of the children already in the foster home; (2) ensure that children were not placed in dangerously overcrowded foster homes where they were subjected to physical, emotional, and sexual abuse; (3) assist foster parents with any problems and ensure that they receive all necessary supports; and (4) report to licensing staff any concerns regarding the condition of the foster home . . .

(Doc. No. 63, ¶ 9). Plaintiffs allege that "Barbara Jones knowingly placed R.M. in a severely overcrowded and unsafe foster placement without any concern for the foster parents ability to care for a three year old child." (Doc. No. 63, ¶ 132)..

Defendant Barbara Jones' arguments for dismissal are similar to those put forth by Brown, including that Plaintiffs have plead insufficient facts to support a § 1983 claim and that qualified immunity should apply. Plaintiffs allegations against Barbara Jones concern her placement of R.M. in the Cumberbatch home. Barbara Jones placed R.M., and his sister, in the Cumberbatch home on the home's first day of licensure. Even though the home was only licensed for one child, when R.M. and his sister arrived there were already two foster children and four natural children living in the home. Barbara Jones was purportedly involved in seeking and receiving a waiver of occupancy cap, which did not comply with the Department's policies or procedures. on the Cumberbatch license. This waiver resulted in the Cumberbatch home containing eight children, three of which were infants.

Defendant is correct when she argues that allegations concerning failure to follow state policies and procedures "do not support a claim for damages such as the Rays." *Ray*, 370 F.3d at 1085. Nevertheless, knowledge of such failures to comply with policies may play a part in the responsibility of Defendant to ensure the child's safety and the overall risk or dangerousness of a given placement. Relatedly, while Defendant was aware of Mrs. Cumberbatch's limited mobility and her status as a brand new and overcapped foster parent, she nonetheless ignored Mrs. Cumberbatch's statements concerning her being overwhelmed and her not being able to handle all the children.

Defendant Barbara Jones also argues that Plaintiffs have failed to adequately

plead causation. For the reasons discussed in reference to Defendant Brown, Plaintiffs allegations concerning causation are similarly sufficient. Given this, Plaintiffs' allegations concerning Barbara Jones' knowledge of the dangerous environment into which she placed R.M. sufficiently states a cause of action for a constitutional violation and a § 1983 claim. Additionally, qualified immunity is inapplicable given the aforementioned and because the constitutional right was clearly established. Therefore, Defendant's Motion to Dismiss (Doc. No. 80) is **DENIED**.

### Defendant E.J. Foltz

■ As alleged in Plaintiffs' Second Amended Complaint, Defendant E.J. Foltz was employed by the Department in the licensing unit, who had the responsibility to:

> (1) perform the initial licensing and annual re-licensing of foster homes assigned to him; (2) thoroughly assess, screen[,] and evaluate those homes to ensure that they were not dangerously overcrowded and that foster parents were capable of providing for the safety and welfare of the children in the home; (3) evaluate the home to ensure that the home complied with licensing standards and that the foster parents were meeting the needs of the foster children in the home; (4) obtain information from all foster care counselors assigned to any child who had resided in the foster home during the license year when performing the re-licensing reviews; (5) perform overcapacity visits of all homes assigned to him; (6) coordinate and follow up with any abuse or neglect investigation of a family foster home to which he was assigned; (7) investigate all foster home concerns assigned to him; (8) deny licensing and re-licensing to any

foster home in which the foster parents were unable to supervise the population of children in the home or deny licensing and re-licensing until the dangerous conditions were ameliorated. At all times relevant hereto, defendant Foltz had the ability, authority[,] and means to request removal of children from any foster home where they were at substantial risk of serious harm.

(Doc. No. 63, ¶ 5). Plaintiffs allegations against Foltz concern his involvement in the re-licensure of the Joyner home and the licensure of the Cumberbatch home.

Defendant Foltz' arguments for dismissal are similar to those put forth by the preceding Defendants and include that Plaintiffs have plead insufficient facts to support a § 1983 claim and that qualified immunity should apply. Plaintiffs assert that the operative Complaint sufficiently alleges a deliberate indifference to a substantial risk of serious harm. In terms of the Joyner home, Plaintiffs allege that Foltz was aware of numerous facts, which include: (1) Ms. Joyner was a single female: (2) the home was severely overcrowded (housing upwards of 14 children); (3) that Ms. Joyner's 16–year–old daughter was sometimes left in charge of the children; (4) Ms. Joyner was suffering from debilitating back pain and stress; (5) Ms. Joyner could not control older children who were sexually and physically acting out in the home; and (6) the department instituted no plans of care to protect foster children in the home from being sexually abused by the sexually aggressive children in the Joyner home.

In spite of having this information, Foltz re-licensed the Joyner home in 2000. When re-licensing, a counselor and a supervisor are to review the history of the home, review behaviors of children, and

address any and all foster home concerns, abuse reports, or other matters relating to the safety of the children in the home. The re-licensing Standards Checklist for the Joyner home, signed by Foltz, explained that Ms. Joyner was currently fostering 7 children and had provided respite care (short-term care typically lasting a few weeks) to over 40 children that year. Foltz also noted that Ms. Joyner was experiencing serious back pain. Plaintiffs allege that even though Foltz was required to investigate the abuse reports no investigations were ever done.

In summary, Plaintiffs allege that Foltz knew, based on the aforementioned information known by him, that the placement of any child into the Joyner home would place that child at significant risk of serious harm.

In terms of the Cumberbatch home, Foltz was the licensing counselor assigned to assess and evaluate the quality and fitness of the Cumberbatches as foster parents and to recommend whether the Cumberbatch home should be licensed. The procedure for licensure requires foster parents to fill out an application and to undergo a ten-week (30 hour) training. Plaintiffs claim that Foltz never required the Cumberbatches to fill out an application, nor were they required to undergo the 30 hours of training. During the training period, a family should have three home visits with licensing staff. Plaintiffs claim that Foltz, as the licensing counselor, should have performed these visits, during which he was required to observe and access the family dynamics and the ability of the Cumberbatches to provide a safe

haven for foster children. Plaintiffs further claim that no home visits were performed prior to the licensing and that the only time Foltz visited the home was on the day of licensure to obtain the Cumberbatches' signatures on necessary papers.

At this first meeting on the day of licensure, Plaintiffs allege that Foltz became aware that Mrs. Cumberbatch was "morbidly obese" and that she "had trouble performing simple functions such as walking, cooking, cleaning[,] and bathing" and that she "could not safely care for foster children." (Doc. No. 63, ¶ 67). Additionally at this meeting, Mrs. Cumberbatch refused Foltz access to her biological children and would only allow discussions with her children in her presence. Plaintiffs further allege that Foltz was required to evaluate all abuse and neglect allegations concerning the prospective foster parents. At the time of licensure, Mr. Cumberbatch was the subject of two child abuse reports, neither of which were allegedly investigated. Based on these factual allegations, Plaintiffs assert that Foltz knowingly failed to complete any meaningful assessment or review of the Cumberbatches' fitness.

Plaintiffs also set forth numerous allegations concerning the failure of Foltz to adequately investigate the Cumberbatches' foster record in Michigan. Plaintiffs claim that Foltz (1) failed to request all information routinely required to process the licensure of foster parents; (2) only received a portion of the information requested; and (3) made no effort to obtain any of the missing documents.[2]

In summary, Plaintiffs allege that Foltz (along with Defendants Deborah Jones and

---

**2.** The Court recognizes that the Eleventh Circuit has held that failure of foster care officials to follow Department guidelines and procedures, by itself, does not support a

§ 1983 claim for damages, *Ray*, 370 F.3d at 1084–85, but also recognizes that Plaintiffs' are not asserting these as the sole factual basis.

Corley)knowing that the Cumberbatches had not completed the required training or the extensive application process, knowing that Mrs. Cumberbatch was secretive and unwilling to allow open conversations between the Department and her own children, knowing that *no investigation* had been done to support a conclusion that the home was safe for foster children, and knowing that the Cumberbatches had been twice reported to the Florida Abuse Hotline-recommended the Cumberbatch home be licensed for one child, and thereafter, upon placement of four foster children in the home within days of licensure, sought a waiver of the licensed capacity restrictions. After placement of R.M., Foltz allegedly became aware that a Department employee described Mrs. Cumberbatch as "one of the worst parents we have" and removed a child from the home; yet, he took no action and engaged in no investigation. Further, despite the knowledge that the home was far overcapacity, Foltz failed to perform required overcapacity visits.

It is clear to this Court that such allegations. taken as true, state a claim for deliberately failing to learn of the significant risk of serious harm to R.M. that was created when Foltz recommended the rubber-stamped licensure of the Cumberbatch home and re-licensure of the Joyner home and when Foltz ignored subsequent signs that the homes were unsafe.

Defendant Foltz also argues that Plaintiffs have failed to adequately plead causation. For the reasons discussed in reference to Defendant Brown, Plaintiffs allegations concerning causation are similarly sufficient. Given this, Plaintiffs' allegations concerning Foltz's actions/inactions in regards to the re-licensure of the Joyner home and the initial licensure of

the Cumberbatch home sufficiently state a cause of action for a constitutional violation and a § 1983 claim. Additionally, qualified immunity is inapplicable given the aforementioned and because the constitutional right was clearly established. Therefore, Defendant's Motion to Dismiss (Doc. No. 87) is **DENIED**.

### Defendants Deborah Jones and Nancy Corley

 Because Defendants' Motion to Dismiss (Doc. No. 89) and Plaintiffs' Response (Doc. No. 95) deal with these Defendants together, so to will the Court. In so doing, the Court will specifically note those allegations that are asserted against only one of the Defendants.

As alleged in Plaintiffs' Second Amended Complaint, Defendant Nancy Corley was employed by the Department as an Operations Program Administrator (OPA) supervising the licensing of foster homes and the placement of children, who had the responsibility to:

(1) ensure that family foster homes were licensed and regulated in accordance with applicable state statutes, administrative rules[,] and applicable department regulations; (2) ensure that children placed in homes were safe and that the conditions in the home met minimum state foster care standards; (3) confirm the safety and well-being of each child in the home during the licensing year from the counselor responsible for supervision; (4) deny exceptions to licensed capacity when the physical characteristics and the combination of children in the home posed a substantial risk of harm to the children placed there; (5) ensure that children were not placed in family foster homes at a time when there were open abuse investiga-

tions or foster home concerns; (6) ensure that children were not left in dangerously overcrowded foster homes where they were subjected to physical, emotional, and sexual abuse: (7) ensure that children who posed a known substantial risk of harming other children were not placed in situations where they were in a position to harm other children and; (8) ensure that recruitment and retention workers performed regular overcapacity visits to all homes where there were more than five children in the home.

(Doc. No. 63, ¶ 7).

Plaintiffs' Second Amended Complaint alleges that Defendant Deborah Jones was employed by the Department as a supervisor in the licensing unit, who had the responsibility to:

(1) assign counselors to perform the licensing and annual re-licensing of foster homes; (2) ensure that all homes being re-licensed were thoroughly assessed, screened[,] and evaluated so that the homes were not dangerously overcrowded and that foster parents were capable of providing for the safety and welfare of the children in the home; (3) ensure that licensing counselors performing annual re-licensing obtained information from all foster care counselors assigned to any child who had resided in the foster home during the license year; (4) deny exceptions to licensed capacity where such exception would place the children in the home at substantial risk of harm; (5) ensure that licensing counselors performed regular overcapacity visits of all homes that were known to be overcrowded; (6) receive all reports of abuse and neglect (FPSS reports), including reports of child on child sexual abuse, which related to a licensed foster home; (7) coordinate with assigned counselors to follow up on any abuse or neglect investigations in a family foster home prior to approving a home for re-licensure; (8) receive all foster home concerns regarding a licensed foster home; (9) assign counselors to investigate all foster home concerns; (10) notify the placement unit regarding any homes which there were foster home concerns pending investigation: (11) communicate with the placement unit regarding any homes in which there were foster home concerns pending investigation; and (12) deny or delay licensing or re-licensing to any foster home in which the foster parents were unable to supervise the population of children in the home or until such time as the dangerous conditions were remedied.

(Doc. No. 63, ¶ 6).

Similar to the preceding Defendants, Deborah Jones and Corley argue that there are insufficient facts to support a § 1983 claim and that qualified immunity should apply. In order to determine whether Plaintiffs' allegations are sufficient to state a § 1983 claim the Court recounts the relevant allegations concerning Defendants' knowledge about the Joyner and Cumberbatch homes and their actions/inactions related to each home.

Plaintiffs allege that Deborah Jones and Corley allowed the population of the Joyner home to swell to 14, even though the home was only licensed for 4–5 children and further allowed children with known sexual aggression to reside in the overcrowded environment without providing additional support or services and without putting in place a plan of care to ensure that sexually aggressive children did not abuse other children in the home. Plain-

tiffs allege that Defendants had personal knowledge of the following information related to the Joyner home: (1) 14 abuse reports called in during 2000; (2) the severely overcrowded environment; (3) Ms. Joyner's suffering from debilitating back pain; (3) Ms. Joyner's inability to control the sexual and physical acting out of older children in the home; and (4) the lack of any plans in place to protect foster children from abuse at the hands of sexually aggressive children. Nonetheless, in light of the aforementioned knowledge, Defendants allegedly did nothing and, in fact, allowed the Joyner home to be used as an unlicensed day care facility providing respite care, thereby increasing the number of children in the home.

Specifically in regards to R.M., Corley approved the waiver for R.M. and his sister to be placed in the Joyner home (bringing the total foster children count to 8) in spite of being aware of the foregoing information. During R.M.'s placement in the Joyner home, Deborah Jones was apparently made aware that a 9–year–old child in the home was displaying serious behavioral problems and that Ms. Joyner could not handle him and take care of the many babies who were residing in the home. Based on the foregoing, Plaintiffs' allege that Deborah Jones and Corley knew that foster children placed in the home were at risk of being sexually abused by other foster children or respite children.

Plaintiffs also put forth allegations against Defendants concerning the Cumberbatch home. These allegations include failing to investigate abuse allegations concerning Mr. Cumberbatch before licensing the home and allowing the licensure in spite of the fact that the Cumberbatches did not undergo the required 30 hour training. Most importantly, Plaintiffs allege that Deborah Jones and Corley "knowingly failed to complete any meaningful assessment or review of the Cumberbatches['] fitness to safely foster children and simply filled out and gathered pre-printed forms regarding the licensure of the home." (Doc. No. 63.¶ 76) Relatedly. Plaintiffs' allege that Deborah Jones falsified documents that indicated Mrs. Cumberbatch had completed trainings. which she had in fact not.

Almost immediately after licensure of the Cumberbatch home, Corley approved an overcapacity waiver, again allegedly without any type of investigation as to the safety of doing so. After the Department placed four foster children in the home (3 over the recommended number). Deborah Jones allegedly failed to ensure that biweekly overcapacity visits to the Cumberbatch home were performed. Plaintiffs further allege that, even after being informed that the Cumberbatches were uncooperative and confrontational with other Department employees (which caused one employee to remove a child from the home), Deborah Jones still "took no action to investigate" the safety of the home. (Doc. No. 63, ¶¶ 95–96)

Defendants point to these allegations and seemingly argue that they are insufficient because at the most they establish a failure to follow Department procedures and guidelines. The Court does not share in Defendants' interpretation. Instead, these allegations concern Defendants' decision to rubber-stamp a family for licensure without engaging in any meaningful investigation as to the safety of the home. This Court refuses to find that by performing no investigation of foster parents and merely issuing licenses to them, Department employees can successfully insulate themselves from liability by asserting

that they were unaware of the dangerousness of a situation. In essence, Plaintiffs allege that Deborah Jones and Corley actively and deliberately chose not to learn of the risk of abuse. The fact that this is evidenced by their failure to follow Department guidelines and rules does not necessitate a finding that such failures are insufficient to support a § 1983 claim. Instead, the Court believes that the Eleventh Circuit's comments in *Ray* concerning failures of Department employees to follow procedures as being insufficient to state a § 1983 claim apply when a plaintiff attempts to argue that such failures result in a per se constitutional violation and a § 1983 claim. 370 F.3d at 1084–1085. Such is not what Plaintiffs allege. Instead, the failures to follow procedures are merely evidence of their intention to ignore the dangers associated with placing children in a given home. This Court finds that a knowing failure to investigate a prospective foster home (or continue to monitor), if proven, evidences a deliberate indifference to the welfare of a child on the part of the responsible Department official, and the resulting injury must be actionable. Any other finding entirely eviscerates the mission of foster placements- to ensure the safety of children- and the constitutional protections afforded foster children.

The Court further finds that causation is adequately alleged and that qualified immunity is inapplicable. Therefore, Defendants' Motion to Dismiss (Doc. No. 89) is **DENIED**.