[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 04-15003
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 18, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-01063-CV-ORL-19-KRS

OMAR, by and through his
next friend James Kelaher,

                                        Plaintiff-Appellant,

                    versus

GLORIA BABCOCK,
CINDY MORALES,
RAUL MORINGLANE, JR.,
BRUCE ROWLEY,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

**(April 18, 2006)**

Before EDMONDSON, Chief Judge, ANDERSON  and FAY, Circuit Judges.

PER CURIAM:

This is an appeal from the district court's grant of summary judgment in favor of appellees in a civil suit for damages under 42 U.S.C. §1983. Appellant, Omar, was placed in the home of his adoptive mother Joann Davis by the Florida Department of Children and Families ("DCF"). He suffered abuse at the hands of his adoptive mother and now alleges that appellees, all at one time affiliated with Omar's case in DCF, were deliberately indifferent to the abuse that was occurring in Omar's home and therefore not entitled to qualified immunity. The controlling issue in this case is whether appellees had actual knowledge of abuse, and whether appellees acted with deliberate indifference toward the abusive situation in appellant's household. We agree with the district court's ruling that the record contains insufficient evidence of deliberate indifference on the part of appellees.[1] We therefore affirm the summary judgment.

## I. Background

Appellant, Demetrius Omar Jurineack ("Omar"), was taken into custody by the foster care unit of the Florida Department of Children and Family Services ("DCF")[2] on January 16, 1988, after he was abandoned by his birth mother. The

---

[1]The district court entered a lengthy and detailed analysis of the evidence in this matter under date of August 27, 2004.

[2] At the time, it was called the Department of Health and Rehabilitative Services.

2

events of which Omar complains in this case occurred between November of 1989 and June 23, 1993, when he lived with his foster care, and later adoptive mother, Joann Davis. However, the events described below begin with Omar's first placement after he was taken into the custody of DCF.

Omar was first placed temporarily with Joyce Bailey ("Bailey"). Omar's brother, Jamaal, was also taken into custody in January 1988, and the two boys were placed in separate shelter foster homes while the foster care counselor attempted to locate relatives who could care for them. The record reflects that in April of 1988, Bailey reported that Omar was jealous, fought with other children, and was a "monster". Omar was then placed in a shelter home with Vassie Wiggins ("Wiggins"). Wiggins reported that Omar cried frequently, undressed himself during the night, refused to sleep with his pajamas on, was afraid of strangers, and had a withdrawn personality. She stated that his sleeping habits could explain his continued congestion. In September of 1988, Wiggins expressed concern about Omar's continuous water consumption and suspected that he might be diabetic.

In November of 1989, Omar was placed by DCF in the foster care of Joann Davis ("Davis"). Appellee, Gloria Babcock ("Babcock") was the DCF adoption counselor assigned to Omar's case. Babcock had met Davis previously during a

3

training session which prepared foster parents to care for special needs children. Prior to Omar's placement, Davis had been a foster parent to a 13-year old girl named Melissa. Melissa had been sexually abused, thus, Davis was required to attend the special training in order to foster her. Melissa's placement did not work out and Melissa was ultimately removed from the home.

Babcock conducted a home study, completed on August 4, 1988. The study reflected that Davis had experience taking care of younger children, but that at the time she fostered Melissa, Davis did not wish to parent a younger child. In addition, DCF obtained three reference letters for Davis, all of which were positive. An investigation of her employment and her level of income indicated that she had adequate life and medical insurance, her marital status was verified, the home visit indicated that the living arrangements were appropriate, a physician's report indicated normal physical findings, and finally, abuse registry and police checks indicated that she did not have a criminal history or a history of abuse.

Davis later advised Babcock that she would like to adopt a younger child, Vernetta. Although she expressed a commitment to Melissa, who remained in counseling for sexual abuse suffered prior to her placement, Davis also felt that parenting Melissa did not give her the nurturing experience she could get from

4

parenting a younger child. Babcock conducted a second adoptive home study on February 3, 1989. Babcock obtained three references for Davis since Melissa had been placed with her, and each stated that Davis was an excellent parent who was capable of parenting two children. Police and abuse registry checks again came back negative. Babcock concluded that Davis had demonstrated that she was capable of caring for both children.

Davis later contacted DCF in May of 1989 requesting that Melissa be removed from her home. Apparently, Melissa had been acting out sexually, and Davis felt Melissa had disrespected her church by taking a boyfriend into the back of the church. Davis also reported that Melissa was talking back and would not obey. The adoption counselor offered counseling, as no placement for Melissa was immediately available. The record indicates that Melissa and Davis were trying to work out their differences, however, Melissa ultimately left the Davis home.

In June of 1989, with Babcock acting as the adoption counselor, Omar was placed in the Davis home along with his brother, Jamaal, and an unrelated girl renamed Keisha. No home study for this placement has been identified in the record, however, Babcock remained in regular contact with Davis and Omar over the fourteen months she was assigned to his case. The record indicates that in sum, Babcock conducted home visits with Davis and the children in March, April, May,

5

August, September, October, and November of 1990, and in January of 1991. The reports from her home studies indicate that in general, the children were doing well, that they remained in counseling, and that the family members were adjusting well to living with each other. Babcock noted that Davis had difficulty finding after hours care for the children. She also noted that Omar had been hospitalized for seizures and that he was referred to CMS on May 7, 1990.

On September 12, 1990, DCF officials Gloria Babcock, Cindy Morales ("Morales"), and Bruce Rowley ("Rowley") attended an Administrative Review Conference. The conference report indicated that DCF intended to follow through on Davis' adoption of Omar. In December of 1990, a suspicion that Omar had been abused was raised and documented in a Child Protection Team Report ("CPT report"). Specifically, on December 21, 1990, Omar was admitted to Arnold Palmer Hospital for treatment of pneumonia.[3] Omar was examined by Dr. Villadiego, who discovered a series of loop marks on Omar's body. Dr. Villadiego was concerned that these marks might have resulted from abuse, and he informed DCF of his discovery. Later that same day, Child Protection Team Case Coordinator Bubba Martin spoke with Davis, who said that she had not noticed the

_____

[3] Apparently this was Omar's second visit to the hospital in December, as he was admitted earlier that month following a seizure.

marks on Omar until Dr. Villadiego pointed them out. At the time, Davis could not explain where the marks came from. However, when Davis spoke with Dr. Fahy, a Child Protection Team physician, on December 24, 1990, Davis reported that the marks were caused when Omar's 11-year old brother hit him with an electrical cord.

DCF assigned appellee Raul Moringlane, Jr. ("Moringlane") to investigate Omar's alleged abuse. Moringlane testified that he had no independent recollection of the case, which was assigned to him some thirteen years before his testimony. However, Moringlane conjectured that, because the DCF report regarding this incident could not be found, the report must have considered the allegations "unfounded" based upon Moringlane's investigation. Moringlane testified that "unfounded" reports were routinely destroyed at the time he would have investigated Omar's case.

In January of 1991, Babcock conducted another home visit to the Davis home and found that Davis and the children were doing well. Appellee, Bruce Rowley ("Rowley"), the Adoptions Supervisor, subsequently signed a Consent to Adoption dated January 16 1991. Davis adopted Omar on February 28, 1991, along with his biological brother and an unrelated girl.

The following evidence of abuse to Omar in the Davis home came to light

7

after his adoption in February of 1991. On October 24, 1991, a report of child abuse in the Davis home was made to the Florida Protective Services System. The report was closed without classification. In December of 1992, Davis filed a Missing Persons report when the three children left home. In January of 1993, two reports of child abuse in the Davis home were made to the Orlando Police Department, one on January 14, 1993 and again on January 29, 1993.

On February 11, 1993, the Children's Home Society referred Omar to Lakeside Alternatives, Inc. for a psychological evaluation. During the evaluation, Davis said that Omar was obstinate, lied frequently, drank out of the toilet, and stole food. He was having behavioral problems in school and had difficulty controlling his anger. On one occasion, he had attempted to stab his eight-year-old sister. The psychological evaluation stated that Omar was depressed and emotionally deprived, and it  recommended counseling for Omar and Davis. The report contained no reference to child abuse.

On May 4, 1993, another report of child abuse in the Davis home was made to the Florida Protective Services System. On June 23, 1993, Omar and his two siblings were removed from the Davis home and placed in DCF shelter care. While in shelter care, the children revealed that abuse was ongoing in the Davis home since autumn of 1989. They said that Davis did not provide them with

sufficient food and often left them alone at night. Other incidents included forcing the children to sleep in the garage, tying them to the bedpost, locking them in an animal cage, forcing them to eat feces and vomit, and hitting them. None of the parties dispute that there is evidence of abuse to Omar post-adoption.

Linda Radigan, a former DCF official, served as an expert witness for the plaintiff. Radigan worked at the Florida DCF central office from 1992 to 2002. Her affidavit alleges various deficiencies in the procedure followed in placing Omar with Davis. Radigan states that DCF officials failed to follow departmental policies.[4] She states that DCF failed to conduct a home study of the Davis home prior to Omar's placement, and that the files did not contain sufficient documentation to show how Omar and his brother were chosen for Davis. She further opines that DCF failed to train, evaluate, and prepare Davis to care for the three children. Radigan further testified that appellees missed signs of abuse, such as Omar's declining health, the loop marks found on his body, and the power struggles between Omar and Davis documented by Davis' psychologist, Dr. Freeman. She states that this information would have been conveyed to appellees Babcock and Rowley through routine DCF procedures. Finally, Radigan testifies that the observance of loop marks could not be classified as unfounded because

---

[4] Radigan does not cite to these policies or state when they were in effect.

9

even if one child was injured by another child, the parent is still responsible for failing to protect the injured child.

Omar filed suit in district court on September 12, 2002, alleging that appellees Moringlane, Rowley, Morales, and Babcock violated 42 U.S.C. §1983 by depriving Omar of his constitutional right to be free from unwanted abuse in his foster care and adoption placement with Davis. Appellees moved for summary judgment. They also moved to strike Radigan's affidavit, along with the depositions of Barbara Holmes, a DCF foster care specialist, and Joan Adkins Lindsey. The district court entered an order striking portions of the affidavit and granting the motion for summary judgment. Omar now appeals.

## II. <u>Discussion</u>

We review a district court's grant of summary judgment *de novo*, viewing evidence in the light most favorable to the opposing party. <u>Kerr v. McDonald's Corp.</u>, 427 F.3d 947, 951 (11th Cir. 2005). The issue before us is whether appellant has provided sufficient evidence of deliberate indifference to defeat appellees' assertion of qualified immunity.[5] The appellees are not subject to this

---

[5] Appellant also argues that the district court erred by striking portions of an affidavit provided by plaintiff's expert, Linda Radigan. This argument is entirely without merit as the stricken statements contain legal conclusions as to whether appellants acted with deliberate indifference.

Federal Rule of Evidence 702 allows for the presentation of expert testimony, however, if the jury does not need the assistance of an expert to understand the case, or if the witness simply

10

damage suit unless the record contains evidence that they (1) actually knew of a risk of serious harm; (2) recklessly disregarded that risk of harm; and (3) their conduct was more than merely negligent. See Ray v. Foltz, 370 F.3d 1079, 1083 (11th Cir. 2004); see also Taylor v. Ledbetter, 818 F.2d 791, 796 (11th Cir. 1987)("A child abused while in foster care, in order to successfully recover from state officials in a Section 1983 action, will be faced with the difficult problem of showing actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home"). We conclude that the record contains insufficient evidence of deliberate indifference, and that the court's grant of summary judgment was appropriate.

The record contains no evidence that appellees knew of a risk of serious harm to Omar. To be deliberately indifferent, an official must not only be aware of facts suggesting a substantial risk of serious harm to the plaintiff, but the official

---

recounts the facts and then offers an opinion as to the conclusion which the jury should reach, such expert testimony is not permitted. See Montgomery v. Aetna Cas. & Sur. Co., 892 F.2d 1537, 1541 (11th Cir. 1991). Moreover, a plaintiff cannot rely on legal conclusions articulated by an expert to meet his burden of coming forward with relevant evidence. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

As the district court noted, Radigan was not qualified as an expert on the state of mind of others. Several paragraphs of her testimony stated conclusions such as, "the defendants consciously disregarded known signs of abuse," and "absence of the required planning... demonstrates reckless disregard." Thus, we find no error in the court's decision to strike the portions of Radigan's testimony which contain legal conclusions as to another person's state of mind.

11

must also draw the inference that the plaintiff is likely to be harmed. See Ray, 370 at 1083 (citing Farmer v. Brennan, 511 U.S. 825 (1994)). The record contains evidence that, prior to Omar's adoption, he had some documented illnesses, he displayed evidence of psychological problems, and on one occasion, his doctor discovered loop marks on his body. There is no evidence, however, that any of the appellees actually drew the inference that these facts meant Omar was being abused by Davis. In fact, the only evidence is to the contrary.[6] Moreover, there is no evidence that any of the physicians who treated Omar suspected these illnesses resulted from abuse. Appellees would therefore have no reason to suspect otherwise. Thus, there is no evidence that appellees actually knew or even suspected that Omar was being abused prior to his adoption by Davis.

There is also no evidence that appellees recklessly disregarded a risk of harm to Omar or acted in a manner that was more than merely negligent. "Deliberate indifference is not the same thing as negligence or carelessness," Ray, 370 F.3d at 1083. Moreover, mere failure to follow DCF policy by gathering certain information does not rise to the level of deliberate indifference. See Id. at 1084-85. Instead, the plaintiff is required to provide evidence that the defendants

_____

[6] According to Moringlane's testimony, the report of a suspicion that Davis was abusing Omar was determined "unfounded." There is no evidence that anything other than an unfounded report was filed.

deliberately disregarded actual knowledge of abuse. Id.

There is no evidence that any of the appellees' failure to conclude that Omar was being abused was anything other than an unfortunate miscue. The fact that Moringlane may have determined incorrectly that Davis was not abusing Omar is insufficient to support a finding of deliberate indifference. Moreover, Babcock's possible failure to conduct a home study prior to Omar's placement with Davis does not rise to the level of deliberate indifference. Babcock is not certain whether she actually conducted the home study in question, and the study is not in the record. The record does show, however, that Babcock was familiar with the Davis household, that she maintained regular contact with the family, and that she conducted studies of the Davis home on several other occasions while Omar was under her supervision. There is no evidence that Babcock suspected at any point that Davis was abusing Omar, that she deliberately disregarded a known risk to Omar, or that she deliberately failed to learn of his abusive situation. Thus, even assuming that Babcock was required to conduct a home study specific to Omar prior to his placement and that she failed to do so, her failure to follow that particular DCF policy would not amount to deliberate indifference.

As for appellants Morales and Rowley, they had only supervisory authority over the situation and therefore had a more limited view of Omar's situation. The

only information to which they potentially had access was Babcock's reports and the December 1990 CPT report. Since neither Babcock nor Moringlane indicated any suspicions of abuse to their supervisors, they would have no reason to believe otherwise given their lack of direct contact with the Davis household. Moreover, Morales and Rowley cannot be implicated based solely upon their supervisory authority. See Miller v. King, 384 F.3d. 1248, 1261 (11th Cir. 2004)("It is well established in this circuit that supervisory officials are not liable under §1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior")(internal quotations and citations omitted). Thus, there is insufficient evidence that Morales and Rowley acted with deliberate indifference with regard to the appellant.

## III. <u>Conclusion</u>

As noted by the district court, Omar's history is indeed a tragedy, and one that begins at a very young age when he was first abandoned by his birth mother. The likelihood that Omar was abused by his adoptive mother, Davis, is truly an unfortunate circumstance. However, this is a case about whether or not the officials in charge of Omar's well-being while he was in foster care acted with deliberate indifference toward a situation which they knew to be an abusive one, and the answer to that is no. Appellant has not met the burden of showing that

appellees acted with deliberate indifference. There is simply no evidence in the record that any of the appellees actually considered Omar's situation in the Davis home to be an abusive one prior to his adoption, or that they deliberately disregarded any knowledge of abuse to Omar. We therefore affirm the district court.

**AFFIRMED.**